OPINION OF THE COURT
Burton B. Roberts, J.
On July 28, 1976 at about 5:30 a.m., Alonzo “Big Al” Johnson was shot three times in front of 89 Lenox Avenue. A police officer who came on the scene almost immediately took Mr. Johnson to Harlem Hospital where he was pronounced dead. An investigation into the homicide yielded no leads until November of 1977 when a Detective Cappetta was introduced to Eugene Ricci by another detective who used Mr. Ricci and his wife Patricia as informants. Mr. and Mrs. Ricci, in addition to their marital relationship maintained a pimp-prostitute arrangement as well. The Riccis related a tale of several meetings with the defendants just subsequent to the death of Alonzo Johnson during which meetings, inter alia, the defendants inculpated themselves in the homicide. This lead was pursued *101 by Detective Cappetta but the New York County District Attorney’s office was not informed or consulted.
In mid-February of 1978, a year and seven months after the crime and some three months after the first information given by the Riccis, Jose Garcia was first introduced to Detective Cappetta by the police officer who had arrested him for criminal possession of a weapon in the third degree. Mr. Garcia claimed to have information about four homicides including the “Big Al” killing.[1] On the basis of his interview with Garcia, Detective Cappetta arranged to have Garcia “paroled” (released on his own recognizance) on the weapons charge and an appointment for another meeting with Detective Cappetta was set for the next day. Mr. Garcia, with what, in the light of later events, might be characterized as congenital unreliability, failed to appear for both the meeting and the adjourned court date of the weapons case. Mr. Gracia’s reappearance as a witness was occasioned by his arrest for possession of yet another loaded gun on March 27, 1978. Garcia asked for Detective Cappetta and the two met again on March 30, 1978 in Criminal Court Part AP17. Profiting from prior experience, the court remanded Mr. Garcia on the two weapons charges. On April 4, 1978, Garcia was produced in the office of the trial Assistant District Attorney and told of various conversations with the defendants both before and after the fact which implicated them in the killing of Alonzo Johnson.
Both Garcia, testifying under a waiver of immunity, and Eugene Ricci gave evidence before a Grand Jury which filed an indictment charging murder in the second degree against these three defendants on April 28, 1978.
In July of 1978, Garcia was sentenced to five years’ probation on the two felony weapons charges on condition that he be referred to and restrained in a program run by the Office of Drug Abuse Services (ODAS) by Judge Haft. This sentence was based in large measure on the representation to Judge Haft by the trial assistant in this matter that Garcia was a co-operating witness in the instant case. *102 Mr. Garcia again characteristically, promptly absconded from the ODAS facility. In October of 1978, Detective Cappetta found Garcia and brought him to the District Attorney’s office for an interview with the trial assistant. When left in an office to await the interview, Mr. Garcia again went A.W.O.L.
On January 10, 1979, the trial of this indictment commenced with Garcia’s whereabouts still unknown. During the course of the case the trial assistant sought and obtained from this court a material witness order for Garcia. On January 26, 1979, Garcia was arrested as a material witness after jumping from a window to avoid apprehension. During the trip down to the courthouse Garcia asked Detective Cappetta if he had to testify. Detective Cappetta replied that Garcia’s testimony was “a condition of his probation”. The detective also noticed what he thought were fresh track marks on Garcia’s arm indicating the recent use of narcotics. (Both of these facts came out at the postconviction hearing. They were not conveyed to any member of the District Attorney’s office or to any of the defense counsel during the trial.)
On that very afternoon, Garcia commenced his direct testimony at the trial. The testimony was so nebulous, including an initial misidentification of one of the defendants, that the court had to repeatedly caution the able prosecutor not to lead the witness. Indeed at one point the court called a recess so that the prosecutor could speak to the witness. Garcia was exhaustively cross-examined regarding his prior criminal activities, the probation deal he had received for his testimony, and his drug addiction. On January 31, 1979, the jury rendered a verdict convicting all three defendants of intentional murder.
On March 14, 1979, about a month after the defendants were each sentenced to a term of imprisonment of 15 years to life, Franklyn Gould, the attorney for the defendant Osorio, began receiving phone calls first from Anna Hernandez, Osorio’s sister,, and then from Jose Garcia himself. On May 18, 1979, Anna Hernandez brought Garcia to Mr. Gould’s office and they had a 15-minute taped conversation. In that conversation Garcia claimed that his trial testimony was false and had been put into his mouth by the *103 police. After a hiatus caused by the shooting (apparently unrelated to this case) of Garcia in The Bronx, Mr. Gould arranged for a polygraph test of Mr. Garcia. The test was administered by Nat Laurendi who concluded that Garcia’s recantation was truthful. Mr. Gould then prepared an affidavit which Jose Garcia signed and, on September 7, 1979, it was filed with this court as part of a motion to vacate the judgment of conviction. This motion was subsequently joined in by Mr. Figueroa and Mr. Villar, the codefendants. In October, 1979 Detective Cappetta learned of the recantation and had a taped interview with Garcia. After this interview Garcia was brought to the District Attorney’s office for an interview with the trial Assistant District Attorney. These meetings resulted in yet another Garcia statement in which he recanted his recantation.
A comparison of the two taped conversations and the two written statements reveals inconsistencies, omissions and outright contradictions (including a denial by Garcia that he ever read the affidavit he signed for Mr. Gould). More questions are raised than answered by the tapes and statements.
On October 24, 1979, at the suggestion of the court, another polygraph test was administered to Garcia by Richard Arthur. A further test was scheduled for the next day but Garcia, true to form, failed to appear. He did, however, later call Mr. Gould to say he had been injured. On March 4, 1980 the second half of the polygraph examination was finally conducted. Mr. Arthur concluded that Garcia was telling the truth at the trial and that his recantation was the product of fear.[2]
On May 27,1980 Garcia was called to the stand to testify at the hearing on the motion to vacate the judgment of conviction. Since the trial of this indictment he has been arrested and convicted on still another charge and is presentedly serving a sentence of 2 to 4 years which, with the consent of the District Attorney’s office covered his violation of probation on the two weapons cases discussed above. *104 He asserted his Fifth Amendment privileges and, on the advice of counsel, refused to testify at the hearing unless he was granted immunity. The People, while conceding that they had no current investigation of Garcia which could reasonably be thwarted, nor any intention of prosecuting Garcia for perjury or related crimes, refused to request immunity for Garcia. (CPL 50.30 prohibits a court from granting immunity to a witness, thereby compelling his testimony, absent a request to do so by the People. Thus immunity, which is a creature of statute, can only be conferred at the People’s discretion.)
The People maintained this position despite a lengthy and repeated plea from the court to request immunity for Garcia in the interests of justice and the truth seeking process. The People contend that to do so would violate their policy regarding recanting witnesses and would establish a detrimental precedent for future cases.
Defense counsel, based upon the evidence adduced at the hearing, assert two basic grounds which, either singly or cumulatively, they feel mandate a vacatur of the judgment: first, Jose Garcia’s recantation; second, the failure of the People to turn over various Brady material, namely:
1. the statement made by Detective Cappetta to Garcia that his testimony was a condition of probation;
2. the fact that Cappetta noticed fresh track marks on Garcia’s arm (in response to a leading question at trial, Garcia testified that he had not used drugs for two years);
3. the statement by Garcia to the trial assistant that he had been involved in a shootout with Dino Maldanado. (Garcia testified he had never fired a gun at anyone); and
4. the fact that Justice Haft had promised Garcia a sentence of no more than three years when he pleaded guilty on the weapons charges.
While not discounting the possible combined effect of these matters on the court’s determination of the motion, this court finds that the last three mentioned items of so-called Brady material are somewhat cumulative to the material actually used to impeach Garcia’s credibility at trial. The first two items, the recantation and what might *105 be construed as a threat to Garcia by Detective Cappetta, are not so easily dismissed. The People, with commendable candor, concede that while they had no actual knowledge of Cappetta’s observations and statements they are chargeable with knowledge of them (Giglio v United States, 405 US 150; People v Churba, 76 Misc 2d 1028; People v Maynard, 80 Misc 2d 279). Certainly nothing at trial or the hearing indicates that the People’s failure to produce this Brady material was even knowing, let alone intentional or venal.[3]
A motion to set aside a verdict based on newly discovered evidence is addressed to the discretion of the court and the burden of proof is upon the defendant by a preponderance of the evidence (CPL 440.30, subd 6; People v Welcome, 37 NY2d 811; contra, see Welcome v Vincent, 549 F2d 853; United States v Zane, 507 F2d 346).
Recantation evidence has been long considered one of the weakest forms of newly discovered evidence (People v Shilitano, 218 NY 161) — particularly when a close relative of a defendant is instrumental in obtaining the recantation. However, a recantation, if credible and material, is one of the most compelling reasons for granting a new trial.
In evaluating a recantation, the court must first judge the credibility of the witness’ recantation and then assess its possible impact on the trial jury. Certainly if Mr. Garcia’s recantation was found to be credible a new trial would have to be ordered. He was one of only three witnesses connecting these defendants to the crime and the Riccis’ testimony was buttressed and corroborated by his testimony. The importance of Garcia to the prosecution is reflected in the fact that the People did not even proceed to the indictment stage in this case until Mr. Garcia corroborated the story the Riccis had told. However, Mr. Garcia’s refusal to testify has left the court without the opportunity to evaluate the first test: is the recantation, or for that matter, the recantation of the recantation, credible?
Similarly, the interpretation and impact of Detective Cappetta’s statement to Garcia regarding his testimony *106 being a condition of probation can only be assessed from the viewpoint of Jose Garcia. Certainly, Garcia’s expertise in manipulating the criminal justice system to his own benefit and his repeated changes with the prevailing wind must both be taken into account in assessing the impact of such a statement. The court must also consider the fact that Garcia’s credibility was vigorously attacked by the defense at the trial both in cross-examination and summations. There is no certainty at all, therefore, that the motion to vacate would be granted even if he took the stand and adhered to his initial recantation.
The court, however, by virtue of the People’s refusal to request immunity, is placed in a position where it must make these assessments in a vacuum. The People’s refusal to request immunity on vague “policy grounds”, when contrasted with their repeated use of the plea bargaining process to obtain Garcia’s testimony at trial, and all the facts and circumstances cited above, amounts to more than just playing both ends against the middle. It is a direct and evident affront to the due process rights of these defendants. Due process stripped of its mystique is, after all, nothing more than fair play. “[Substantial interference by the State with a defense witness’ free and unhampered choice to testify violates due process as surely as does a willful withholding of evidence” (People v Shapiro, 50 NY2d 747, 761).
This violation of due process leaves this court with yet another quandary: what is the appropriate remedy for the due process violation?
Perhaps this court could, under the authority of People v Shapiro (supra, p 757 et seq.; see, also, People v Sapia, 41 NY2d 160), direct a grant of immunity to the witness Garcia. However, the law in New York on this point is relatively new and unsettled, particularly as to its application to postconviction hearings. Certainly the life sentences these defendants are serving and the weakness of the case against them at trial, would justify the broadest possible inquiry into their allegation that they were convicted on Garcia’s perjured testimony. If the witness Garcia were granted immunity and testified at the hearing there is no guarantee that the issues would be resolved. *107 However, vigorous cross-examination by the defense, the prosecution and even the court might create a chink in the stone wall the court presently faces. The defendants must be given this opportunity.
In light of all of the facts and circumstances and the current state of the law this court is left with but one alternative. The People’s refusal to request immunity for Garcia which the court has found violative of due process combined with the statement of Detective Cappetta to Garcia which was not disclosed at trial mandate a vacatur of the judgment of conviction. There is no other appropriate remedy available to this court for the due process violation these defendants have suffered.
Therefore, the motion to vacate the judgment of conviction is granted.
The court will stay the effective date of this order for 30 days from the date of its signing. If the People during that time reconsider their decision and request immunity for Mr. Garcia, the court will grant him immunity, reopen the hearing for his testimony, and consider the motion to vacate de novo. If the People do not do so, they can use this time to prepare papers requesting a stay from the Appellate Division pending an appeal of this order. The court would welcome either course of action in this troublesome case, the verdict in which may well have been a miscarriage of justice.
Accordingly, the motion to vacate the judgments of conviction is granted with respect to all three defendants and the effective date of this order is stayed 30 days from date of its signing.

. Information supplied by Garcia with respect to other homicides did not result in any arrests, indictments or prosecutions.

. The court, of course, did not consider the results of the polygraph examinations conducted by Mr. Laurendi or Mr. Arthur. They are, however, illustrative of the fact that no machine known to man can accurately determine the credibility of Mr. Garcia.

. The court indeed wishes to compliment the trial assistant for her ability, zeal and co-operation in this difficult case.