THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v
DOMINGO OSORIO, WILLIAM FIGUEROA and KENNETH
VILLAR, Respondents.

First Department, April 29, 1982

##### APPEARANCES OF COUNSEL

*William J. Comiskey* of counsel (*Robert M. Pitler* with
him on the brief; *Robert M. Morgenthau, District Attorney*,
attorney), for appellant.

*Richard Cushing, Michael Stalonas* and *Franklin Gould*
of counsel (*Julia Pamela Heit, P. C.*, attorney), for respon-
dents.

##### OPINION OF THE COURT

MILONAS, J.

This case involves an appeal by the People from an order
granting defendants' joint motion to vacate the jury verdict
convicting them of murder in the second degree.

On July 28, 1976 at approximately 5:30 A.M., Alonzo "Big Al" Johnson was shot to death on Lenox Avenue between 114th and 115th Streets. The investigation of the homicide proved unproductive until November of 1977, when Eugene Ricci, a reputed drug addict, pimp and informant, approached the police and, asserting that he feared for his life, implicated the defendants. According to Ricci, he and the deceased had, in June of 1976, robbed one "Herbie the Homo", a drug dealer employed by defendant Tony "No-Arms" Osorio, relieving him of 10 bags of cocaine and some cash. Several weeks later, Ricci was threatened by Osorio after defendant Villar, who along with defendant Figueroa, was also present at the meeting, pointed him out. Villar and Figueroa produced guns, but Ricci was purportedly rescued by his wife Patricia, a prostitute and occasional drug user.

Ricci encountered the defendants again a few days following the murder. On that occasion, Osorio told Ricci that he, Ricci, was lucky to be alive. Osorio admitted that he, Villar and Figueroa had killed Johnson. Explaining that he had decided to spare Ricci because of a belief that the latter had not instigated Herbie's robbery, Osorio, with the assistance of the two other defendants, supposedly proceeded to provide the particulars of Johnson's shooting. Once more, Patricia appeared on the scene just in time to overhear Osorio threaten her husband. Ricci also related several other incriminating conversations which he had held with, respectively, Villar and Osorio.

Another prosecution witness, Jose Garcia, turned up in February of 1978. Garcia, a heroin user, was introduced to Detective Fred Cappetta by a police officer who had arrested him for criminal possession of a weapon in the third degree. Garcia claimed to have information concerning four homicides, including that of Johnson. As a result, Cappetta arranged to have Garcia released on his own recognizance. Cappetta testified that while he agreed to speak with the District Attorney, he offered no promises to Garcia. He did, however, make an appointment with Garcia for the next day, but Garcia failed to show up both for this date and the one in court. On March 27, 1978, Garcia re-emerged when he was again arrested on a weapon

charge. Remanded by the Judge (although subsequently paroled), Garcia asked for Detective Cappetta, and the two held a courtroom reunion. Shortly thereafter, Garcia was produced in the office of an Assistant District Attorney where he inculpated the defendants in the murder of Alonzo Johnson.

Garcia and Ricci both appeared before the Grand Jury, which filed an indictment against the defendants for murder in the second degree. Garcia, who was ultimately sentenced to probation, proved to be an extremely reluctant witness at trial. After an abortive attempt to avoid apprehension, he was brought to court pursuant to a material witness order. On the stand, he continued to exhibit his lack of enthusiasm for the proceedings but did implicate the defendants. He was cross-examined extensively regarding his criminal history, his drug addiction and the probation sentence which he had received in recognition of his co-operation. Eugene and Patricia Ricci also testified and recounted their dealings with the defendants. On January 31, 1979, the jury found all three defendants guilty of murder in the second degree, and they were subsequently sentenced to 15 years to life terms of imprisonment, pursuant to which they remain incarcerated.

In August of 1979, Osorio, later joined by his two codefendants, moved to vacate the conviction on the ground of newly discovered evidence after Garcia visited Osorio's attorney and recanted his trial testimony. A hearing on the matter was granted, which commenced on May 27, 1980. Although Garcia was called by the defense, he invoked his Fifth Amendment privilege and refused to testify. Defendants then introduced an affidavit from Garcia repudiating his prior testimony. Franklin Gould, Osorio's counsel, also testified for the defense. Gould stated that Garcia had informed him that he, Garcia, had not told the truth on the witness stand and that he had never had any conversations with the defendants on the subject of the Johnson homicide. In addition to signing an affidavit to that effect, Garcia had made a tape recorded statement, which was also admitted into evidence. Garcia further asserted therein that the police had threatened to prosecute him for the murder of one Dino Maldonado if he did not testify

against the defendants. He initially denied having knowledge of the Johnson shooting and claimed that the police had read the details of the murder to him from a yellow sheet and showed him photographs of the defendants. After his arrest on the second weapons case, the police accused him of carrying a machine gun for Osorio, again displaying defendants' pictures to him and repeating the particulars of the Johnson homicide. Moreover, Garcia said that Cappetta had advised him to concoct a good story. The detectives persisted in threatening to send him back to jail, and he was brought back to the District Attorney's office five or six times. According to Gould, he had difficulty in believing Garcia's account and, therefore, asked him to take a lie detector test. The test indicated that Garcia's recantation was truthful.

To refute the defense version of what happened, the People put on Detective Cappetta, who described in detail his association with Garcia. According to Cappetta, Garcia had furnished him with some information regarding the Johnson shooting which was not commonly known on the street and conformed to facts previously supplied by the Riccis. Garcia was thereafter escorted to the District Attorney's office where he signed a written statement. No promises or threats were made to him. Cappetta, noting that Garcia had referred to the defendants by their first names, showed him an array of some six to eight photographs, three of which were of the defendants. The three pictures which Garcia selected were of the defendants.

Cappetta explained the circumstances surrounding the probation sentence accorded Garcia. In addition, he described an interview, which he secretly taped, held with Garcia in October of 1979. At that time, Garcia related that he had been asked by Osorio's mother and her friend "Nocho" to speak with Franklin Gould, Osorio's attorney. When the lawyer agreed not to disturb him further, he consented to taking a polygraph test. Garcia said that although he had signed an affidavit, he had not bothered to read it. He also insisted that his trial testimony had been truthful. At a subsequent meeting with the District Attorney, Garcia claimed that after the trial, Osorio's mother had requested him to accompany her to the office of Oso-

rio's counsel. He refused, but she nevertheless continued to telephone in an attempt to persuade him to change his mind. Finally, Garcia gave in when a man named "Nocho" personally escorted him to the lawyer's office. After denying to Osorio's counsel that he had been forced to testify, he expressed his willingness to undergo a lie detector test on condition that he be left alone in the future. Two weeks later, Garcia was shot and hospitalized for six weeks. Osorio's mother paid a call on him there. She persisted in visiting him following his discharge, twice bringing Osorio's wife with her. At that point, he took the lie detector test.

Garcia signed a written statement reciting this account, and it was admitted into evidence at the hearing. Unaware that there was a probation violation warrant outstanding against Garcia, the District Attorney permitted him to be released. However, he was arrested two weeks later, but paroled on a day-to-day basis for the purpose of taking another lie detector test, the results of which were that Garcia's recantation was false and his trial testimony truthful. Garcia once more failed to return to court, and ultimately, the sentence of zero to four years which he received for the probation violations was made to run concurrently with a two to four year sentence imposed on him in connection with a burglary indictment.

The hearing continued until the fall of 1980. Upon the court's urging that Garcia be granted transactional immunity, extended discussions on the matter ensued with the District Attorney's office, which, in the end, rejected the request. During the early stages of the proceedings, defense counsel, with the concurrence of the Trial Judge, had asked that the People confer a limited immunity on Garcia to preclude a perjury prosecution arising out of his trial testimony. Although the People agreed, Garcia, upon the advice of counsel, declined to testify in the absence of full transactional immunity. At that time, the court observed that "considering the background of Mr. Garcia, I can understand the District Attorney not wishing to give transactional immunity". As the hearing progressed, however, the Judge began to demand a grant of transactional immunity.

In vacating defendants' convictions and ordering a new trial (108 Misc 2d 100), the court held that the People's refusal to bestow immunity upon Garcia, when contrasted with their repeated reliance on the plea bargaining process to obtain his testimony at trial, and considering all the facts and circumstances of the case, including the failure to disclose at trial the statement made by Detective Cappetta to Garcia that his testimony was a condition of probation, constituted a violation of the due process rights of the defendants. The court also noted the prosecutor's having withheld the following exculpatory material: the information that Garcia had been involved in a shootout with Maldonado, that Garcia appeared to be using drugs on the day that he testified, and that Garcia had been promised a sentence of no more than three years when he pleaded guilty on the weapons charges. The court, in referring to the defense's vigorous cross-examination of Garcia at trial and its attack on his credibility both during questioning and on summation, expressed the view that these latter omissions merely had a cumulative impact on the issue of Garcia's credibility. However, according to the court, there was no certainty that the motion to vacate would have been granted even if he took the stand and adhered to his initial recantation.

On appeal, the District Attorney contends that the court below erred on two grounds: first, it mistakenly assumed that Garcia's testimony was essential to a determination of the motion to vacate, and second, and more importantly, the decision represents a serious misapplication of the law pertaining to immunity. In response, defendants argue that the Trial Judge properly exercised his discretion in vacating the convictions when Garcia was unavailable as a witness due to the People's refusal to grant him immunity, and, moreover, that the court correctly found that the failure of the prosecutor to inform the defense of Detective Cappetta's pretrial threat to Garcia was in violation of the defendants' due process rights.

By statute, only the prosecution possesses the authority to confer full transactional immunity on witnesses. (CPL 50.30.) Nor are they obligated to give immunity for defense witnesses. (*People v Adams*, 53 NY2d 241.) Clearly, the

prosecutorial discretion is not unlimited and is reviewable for abuse when the District Attorney has acted in bad faith or has otherwise engaged in conduct which violates a defendant's due process right to a fair trial. Such abuse will be found, as was the situation in *People v Shapiro* (50 NY2d 747) "if, for instance, the prosecutor builds his case with immunized witnesses but denies the defendant a similar opportunity or affirmatively threatens the defendant's witnesses with prosecution for perjury if they give evidence favorable to the defense". (*People v Adams, supra,* at p 247.) Similarly, the People may not with impunity prevent defendant's access to the testimony of a police informant who has also been an active participant in the criminal transaction. (*People v Sapia,* 41 NY2d 160, cert den 434 US 823.)

The instant case, however, does not present an example of police abuse or misconduct. The witness in question, Garcia, was an extremely disreputable individual with a significant criminal history. Therefore, there was a distinct chance that he would avoid liability for some serious criminal act, including that of murder, were he to be accorded full transactional immunity. Further, Garcia's change of mind is, if anything, a classic illustration of an unreliable recantation. He was represented by counsel when he testified at trial and was permitted to consult with him during the proceedings. While Garcia's co-operation was instrumental in his eventually receiving a sentence of probation, no definite promises were ever made to him nor was immunity offered in exchange for his testimony.

Garcia's recantation may have been the result of pressure placed on him by defendant Osorio's relatives, and he subsequently withdrew it, as demonstrated in affidavits and other evidence submitted by the District Attorney. The People's witnesses repeatedly denied any threats or coercion against Garcia. On the contrary, the weight of the evidence indicates that Garcia volunteered his information to the police. As for the fact that, in return for his testimony, he obtained more lenient treatment with respect to his pending criminal cases, this is a practice which is neither uncommon nor improper and, in fact, constitutes an essential prosecutorial tool. The absence of bad faith by

the People is also shown by their willingness to bestow upon Garcia a limited immunity against prosecution for perjury arising out of his trial testimony.

In its opinion, the court below pointed to the intensiveness of the defense cross-examination of Garcia and the great effort exerted to attack his credibility. How much weight, if any, the jury, in finding the defendants guilty, gave to his testimony is strictly a matter of speculation. What is clear is that the allegedly exculpatory material which the People withheld from the defense would merely have been cumulative. This is just as much the case with Detective Cappetta's statement to Garcia that his testimony was a condition of probation as it is with the three other items which the prosecution neglected to turn over. As the court declared in its opinion, nothing at the trial or the hearing supports the conclusion that the "People's failure to produce this *Brady* material was even knowing, let alone intentional or venal." (108 Misc 2d 100, 105, *supra.*) Consequently, defendant's assertion that the court's action in vacating the convictions was warranted on this ground is without merit. Further, for the reasons heretofore stated, the court committed error in granting defendants' motion because of the District Attorney's refusal to confer full transactional immunity upon Garcia.

Thus, the order of the Supreme Court, New York County (B. ROBERTS, J.), entered March 6, 1981, which granted the defendants' motion to set aside their convictions should be reversed, on the law and the facts, and the motion should be denied and the convictions reinstated.

MARKEWICH and LYNCH, JJ., concur with MILONAS, J.; KUPFERMAN, J. P., and CARRO, J., dissent and would affirm on the opinion of B. ROBERTS, J.

Order, Supreme Court, New York County, entered on March 6, 1981, reversed, on the law and the facts, and the motion denied and the convictions reinstated.