**Domingo ROSARIO, a/k/a Domingo Osorio, Petitioner,**

v.

**Charles SCULLY, Superintendent, Green Haven Correctional Facility, Respondent.**

**No. 87 Civ. 0681 (RWS).**

United States District Court, S.D. New York.

Feb. 10, 1988.

Howard L. Jacobs, New York City, for petitioner.

Robert A. Morgenthau, Dist. Atty., New York County, New York City (Carol A. Remer–Smith, of counsel), for respondent.

## OPINION

SWEET, District Judge.

Petitioner Domingo Rosario, a/k/a Domingo Osorio, ("Rosario") has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition was referred to United States Magistrate James C. Francis, IV, who filed the attached Report and Recommendation with this court on October 30, 1987. In a letter to the court dated November 16, 1987, counsel for Rosario filed objections to the Magistrate's report which recommends that the application for a writ of habeas corpus be denied. On the basis of Magistrate Francis' thorough and well reasoned Report, the petition is dismissed. The following brief opinion addresses the objections raised in the letter submitted by Rosario's counsel.

### The Petition

Rosario was sentenced to a term of imprisonment of fifteen years to life after being convicted of murder in the second degree on March 14, 1979 after a jury trial in the Supreme Court of the State of New York. The background to the instant petition is fully set forth in the Magistrate's Report. It suffices here to note that after the trial, Rosario and his two co-defendants move to vacate their convictions under New York Criminal Procedures Law § 440.10 based upon the recantation of Jose Garcia, a prosecution witness, and the prosecutor's failure to turn over to the defense certain impeachment information relating to Garcia. On March 6, 1981, after a hearing, the trial judge granted the motion and vacated the convictions based upon the prosecution's refusal to grant Garcia transactional immunity during the hearing on the motion to vacate the judgment and on the prosecution's failure to disclose certain impeachment evidence concerning Garcia. On appeal by the prosecution, the order was reversed, and the conviction reinstated. Leave to appeal to the New York Court of Appeals was denied.

On his direct appeal, Rosario raised the issues stated in this petition, other than those raised in the § 440 motion. His conviction was affirmed without opinion, and leave to appeal to the Court of Appeals was denied.

In his letter of objection to the Magistrate's Report, Rosario contends that the Magistrate: (1) did not fully address Rosario's claim that the trial judge denied Rosario a fair trial by cross-examining and rehabilitating prosecution witnesses, interrupting cross-examination by defense counsel, and making sarcastic remarks that denigrated defense counsel; (2) failed to give sufficient weight to the trial court's decision to vacate the judgments of conviction; and (3) wrongly concluded that Rosario should have objected each time evidence as to uncharged crimes was put before the jury.

### Misconduct of the Trial Judge

Rosario's case was tried before a state court judge whose participation in trial pro-

ceedings has been the subject of review by the Court of Appeals for this Circuit on a number of occasions, *see Garcia v. Warden, Dannemora Correctional Facility,* 795 F.2d 5 (2d Cir.1986); *Daye v. Attorney General of the State of New York,* 712 F.2d 1566 (2d Cir.1983), and the New York Court of Appeals. *See People v. Yut Wai Tom,* 53 N.Y.2d 44, 439 N.Y.S.2d 896, 422 N.E.2d 556 (1981); *People v. Mees,* 47 N.Y.2d 997, 420 N.Y.S.2d 214, 394 N.E.2d 283 (1979); *People v. Tartaglia,* 35 N.Y.2d 918, 364 N.Y.S.2d 901, 324 N.E.2d 368 (1974). Recognizing that the "appellate courts of New York have been ... alert to their responsibilities and have not hesitated to order new trials when state trial judges have exceeded the bounds of proper conduct and intervened so extensively as to deny a defendant a fair trial," this Circuit in *Daye* established certain boundaries that circumscribe a federal court's collateral review of a state trial judge's conduct:

> A trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits. The number of questions asked by the judge is not determinative, as we have observed when reviewing the conduct of federal trial judges (citations omitted), though the degree of intervention provides the context in which the risks of adverse questioning should be assessed. (citations omitted). Nor can the fact of some adverse questioning be determinative, because even the most naturally framed questions, asked solely for clarification, may elicit answers devastating to the defendant. Moreover, a trial is not rendered constitutionally unfair every time a trial judge asks a question obviously intended to permit a witness to emphasize testimony helpful to the pros-

ecution or clearly designed to challenge testimony favorable to the defense. At the same time we recognize that some point exists beyond which the quantity and nature of a trial judge's questioning renders a trial unfair in the constitutional sense.

*Daye v. Attorney General,* 712 F.2d at 1572.

In *Daye* the trial judge had engaged in three categories of questioning that the Second Circuit found were detrimental to the defendant. There, the trial judge had repeatedly intervened to afford two witnesses an opportunity to reinforce the certainty of their identification of the defendant, asked questions in which he referred to the robber as "the defendant," and questioned the defendant in a challenging manner that revealed his skepticism about the defendant's testimony. Notwithstanding the qualitative aspect of these instances of the trial court's intervention, the Court concluded "that the trial judge's conduct approached but did not cross the line that permits us to rule that the Constitution has been violated." *Daye v. Attorney General,* 712 F.2d at 1572.

■ After careful review of the transcripts from Rosario's trial, paying particular attention to the pages cited in Rosario's brief to the Appellate Division as examples of the trial court's harmful intervention, the most noteworthy aspect of the trial court's conduct was the sheer number—more than 1500—of questions that he posed to the witnesses. As the Second Circuit held in *Daye,* however, the "number of questions asked by the judge is not determinative." *Daye v. Attorney General,* 712 F.2d at 1572, although here it underscores his zealous exercise of courtroom responsibilities more frequently left to the prosecutor and defense counsel. Some of the judge's questions did elicit material that was helpful to the prosecution,[1] but

---

1. For example, during the direct examination of Eugene Ricci, a witness who testified that he had been threatened by the defendants, the trial judge elicited the following:

> THE WITNESS: Nappy came into the conversation and said, "I had your contract, and I

don't know you personally." Everything was fine, that if his boss didn't order him everything—to kill me, he would let me live.... THE COURT: Are you familiar with the vernacular of the street? THE WITNESS: Yes.

the vast majority of his questions were intended to clarify answers that were inaudible, ambiguous or obscured by the overlap of questions and answers that is common to the trial process.

There is nothing in the record that signals the bias that was apparent in *Daye.* Rosario contends, correctly, that the trial judge directed barbs at defense counsel, yet the transcripts reveal that the prosecutor was targetted as well.[2] Such comments reveal more about the judge's impatience than his opinion as to the defendant's guilt or innocence.

As Magistrate Francis found, the trial judge did not confine his questions to matters favorable to the prosecution. In particular, the judge's persistent inquiries concerning the cooperation arrangements between two of the prosecution's main witnesses and the state squarely presented to the jury the issue of the witnesses' motive for testifying. *See* Trial Transcript at 636–37, 1139, 1141–42. Thus, although the trial judge's conduct may have impaired the ability of both prosecution and defense counsel to try the case as they wished, the overall conduct of the trial was not such that "public confidence in the impartial administration of justice was seriously at risk." *Daye v. Attorney General,* 712 F.2d at 1572.

*Witness Immunity and Withheld Evidence*

At the post-conviction hearing, Garcia refused to answer any questions concerning his recantation of his trial testimony, and subsequent revocation of his recantation. The trial judge held as a matter of law that the prosecutor's refusal to grant Garcia transactional immunity was a "direct and evident affront to the due process rights of these defendants." *People v. Osorio,* 108 Misc.2d 100, 436 N.Y.S.2d 958, 962 (Sup. 1981). The trial judge also found that the

government's failure to disclose certain additional impeachment material violated the defendant's due process rights. Confronted with what he considered to be the impossible task of determining, without the benefit of Garcia's testimony, whether the recantation, or its revocation, was credible, the judge concluded that his only alternative was to set aside the convictions.

The Appellate Division reversed after finding that the trial judge had misapplied the law pertaining to immunity. *People v. Osorio,* 86 A.D.2d 233, 449 N.Y.S.2d 968, 971 (1st Dep't 1982). The appellate court concluded that the record clearly showed that Garcia "was an extremely disreputable individual with a significant criminal history ... [and that] there was a distinct chance that he would avoid liability for some serious criminal act, including that of murder, were he to be accorded full transactional immunity." *Id.* Therefore, the appellate court concluded that the prosecution had not acted in bad faith in refusing to grant immunity. In addition, the appellate court found that in view of the intensity of the defense cross-examination and the thoroughness of the attack on Garcia's credibility, the impeachment evidence that was unknowingly withheld from defense counsel would merely have been cumulative.

 Magistrate Francis properly reviewed the record to determine whether as a matter of law the prosecution's failure to grant immunity and disclose certain impeachment evidence was not a due process violation. Although he considered the trial judge's findings and conclusions, he was not bound to defer to them as presumptively correct. *See Lacy v. Gardino,* 791 F.2d 980, 986 (1st Cir.1986). In reviewing the record *de novo,* the Magistrate found that no showing had been made that Garcia's testimony as to his recantation/revocation would have been exculpatory, *see United*

---

THE COURT: What is meant or what do you find is meant by Nappy saying to you, "I had your contract"? What does that mean?
THE WITNESS: He had to kill me.
THE COURT: Go ahead.

**2.** On one occasion, after prompting defense counsel to object to a particular question, the

trial judge remarked, "I knew you'd come through." (Trial Transcript at 677). On another, the judge expressed dissatisfaction with the proficiency of the Assistant District Attorney by asking, "Is it so difficult to frame a question?" (Trial Transcript at 683).

*States v. Shandell,* 800 F.2d 322, 324 (2d Cir.1986), or that there was a reasonable probability that, had the additional impeachment evidence been disclosed, the outcome of the trial would have been different. *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).

Rosario contends that the Magistrate failed to abide by the trial court's decision on the issues of immunity and withheld evidence. However, as discussed, the Magistrate was not obligated to defer to the trial judge's decisions on matters of law. After reviewing the record, the court concurs with the Magistrate's conclusions that the prosecution's failure to grant immunity and disclose certain impeachment material did not violate Rosario's constitutional rights.

*Evidence of Uncharged Crimes*

Finally, Rosario contends that the Magistrate failed to consider whether the wholesale introduction of evidence of uncharged crimes went beyond the purpose of proving motive or intent. However, the Magistrate found, and the court agrees, that the trial judge did not permit the wholesale introduction of evidence of uncharged crimes. Rather, the record shows that the trial judge properly excluded testimony that was not relevant to motive under the state's theory of the case. The court agrees that the trial judge's evidentiary rulings on the issues of uncharged crimes did not deprive Rosario of a fundamentally fair trial.

For the reasons set forth above, the Magistrate's Report and Recommendation is affirmed. Rosario's application for a writ of habeas corpus is denied and the petition is dismissed.

IT IS SO ORDERED.