**William DAYE, Petitioner-Appellant,**

v.

**ATTORNEY GENERAL OF the STATE OF NEW YORK and Eugene S. Le-Fevre, Superintendent Clinton Correctional Facility, Respondents-Appellees.**

No. 1163, Docket 80–2292.

United States Court of Appeals, Second Circuit.

Resubmitted Dec. 9, 1982.

Decided June 27, 1983.

Phylis Skloot Bamberger, The Legal Aid Soc., Federal Defender Services Unit, New York City, for petitioner-appellant.

Meredith Anne Feinman, Asst. Dist. Atty., New York City (Robert M. Morgenthau, Dist. Atty., Norman Barclay, Asst. Dist. Atty., New York City, on brief), for respondents-appellees.

Before LUMBARD and NEWMAN, Circuit Judges, and METZNER, District Judge.*

NEWMAN, Circuit Judge:

This appeal from the denial of a writ of habeas corpus sought by a state prisoner requires consideration of the constitutional limits upon intervention by a state trial judge in a criminal jury trial to the detriment of the accused. William Daye appeals from a judgment of the District Court for the Southern District of New York (Milton Pollack, Judge) dismissing on the merits his habeas corpus petition challenging his state court conviction for murder and robbery. On our initial consideration of the appeal, a divided panel ruled that Daye had not sufficiently exhausted his state court remedies.

*Daye v. Attorney General,* 663 F.2d 1155 (2d Cir.1981) (*Daye I*). Upon rehearing by the full Court, it was determined that exhaustion had occurred, the panel decision was vacated, and the appeal was remanded to the panel for consideration on the merits. *Daye v. Attorney General,* 696 F.2d 186 (2d Cir.1982) (en banc) (*Daye II*). For the reasons that follow, we affirm the judgment dismissing the habeas corpus petition.

I.

Daye was convicted in the New York Supreme Court in June 1976 of felony murder, intentional murder, and two counts of first degree robbery as a result of events that occurred on March 19, 1974, at the E & D Luncheonette on 144th Street in the Bronx. His conviction was affirmed by the Appellate Division without opinion, *People v. Daye,* 72 A.D.2d 669, 421 N.Y.S.2d 955 (1979), and leave to appeal to the New York Court of Appeals was denied, 48 N.Y.2d 978, 425 N.Y.S.2d 1034, 401 N.E.2d 421 (1979).

The evidence at trial disclosed that a man entered the luncheonette and robbed the patrons and the employees at gunpoint. In the course of the robbery, he pointed a pistol at the cook, while trying to remove the cook's wallet from a rear pocket of the cook's trousers. The robber fired his weapon, fatally wounding the cook. The bullet passed through the cook's body and lodged in a finger of the robber's hand. Several persons in the luncheonette heard the robber exclaim that he had just shot himself in the hand. The robber then pointed his pistol at a patron and an employee and pulled the trigger, but fortunately the weapon misfired. After taking money from several patrons and employees and placing it in a paper bag, the robber fled from the luncheonette. One of the patrons saw him enter a nearby building on 142nd Street and directed police to the building. A detective on the roof of the building saw Daye climb out of a third-floor window of the building and crawl down a drainpipe. The detective

---

* The Honorable Charles M. Metzner of the United States District Court for the Southern District of New York, sitting by designation.

ran downstairs, broke through a hall window on the landing, pulled Daye into the building through the window, and arrested him. One of the patrons, David Miller, who was standing behind the detective on the landing, immediately identified Daye as the person who had robbed the people in the luncheonette a few minutes earlier.

At trial Miller and three others from the luncheonette positively identified Daye as the robber. The prosecution also introduced into evidence a wallet taken from one of the patrons, a small amount of cash in a paper bag, and a pistol identified at trial as the weapon the robber had carried; all these items were found in a third-floor apartment of the building in which Daye was arrested. Perhaps the most devastating evidence was the fact that Daye's left hand disclosed a bullet wound when he was arrested, a bullet was removed from his hand hours later at a hospital, and ballistics evidence confirmed that the bullet had been fired from the pistol found in the third-floor apartment.

Daye was the only witness to testify for the defense. He acknowledged being present in the luncheonette, but claimed to have been a victim rather than the perpetrator of the robbery and the shooting. He testified that he felt a pain in his hand when the cook was shot and later discovered that he had been struck by a bullet. He denied exclaiming that he had shot himself in the hand. He claimed that he ran out of the luncheonette because he had previously been arrested for being present at the scene of a crime and he was afraid of the police.

## II.

The circumstances claimed to have rendered the trial constitutionally unfair concern the extent and nature of the questioning of witnesses, including the defendant, undertaken in the presence of the jury by the state court trial judge, Justice Burton B. Roberts. The flavor of the judge's questioning, including the instances likely to have been most detrimental to the defendant, can be appreciated from a reading of the portions of the transcript set out in the opinion of Judge Lumbard, dissenting from the panel's original decision on exhaustion of state court remedies and favoring granting the writ on the merits. *Daye I, supra,* 663 F.2d at 1160–71. Much of the questioning pressed the witnesses to be precise as to the details of their testimony, especially the exact locations of the witness and the robber. To place the trial judge's questioning in some perspective, we have reviewed the entire state court transcript and conclude that, of the 478 pages reflecting examination of witnesses, on 192 pages Justice Roberts asked no questions, on 257 pages he asked one or more questions that clarified matters in evidence, and on 29 pages he asked questions that elicited new evidence, challenged the defendant's version, or pointedly reenforced testimony favorable to the prosecution.

Three categories of questioning plainly were detrimental to the defendant. First, the trial judge intervened to afford two witnesses an opportunity to reenforce the certainty of their identification of the defendant. After the first witness for the prosecution, William Wright, had identified Daye in the courtroom as the robber, the following occurred:

> The Court: Any questions about that; is that the man?
>
> Wright: No doubt.
>
> The Court: No doubt in your mind?
>
> Wright: No.

During the cross-examination of Wright, the following occurred:

> The Court: Can you make an identification?
>
> Wright: Could I make an identification?
>
> Mr. Russo [defense counsel]: I object to that question.
>
> The Court: Overruled.
>
> Can you make an identification of the person that killed Isaac Stanback [the cook] in the luncheonette?
>
> Wright: Yes.
>
> The Court: And who is the person that killed him?
>
> Wright: This guy right here.

The Court: Indicating the defendant. Still later during the cross-examination of Wright, the following occurred:

The Court: Do you know the man who did the shooting in the restaurant?

Wright: Yes, sir.

The Court: Who is it?

Wright: This guy sitting right here. (Indicating.)

The Court: Indicating the defendant.

This same type of intervention occurred on one other occasion during cross-examination of the prosecution's sixth witness, Dorothy Taylor:

The Court: Is it fair to say that since March 19, 1974, the first time that you have ever viewed the person who you say shot and killed Isaac Stanback is in this courtroom today?

Taylor: This is the first time, yes.

The Court: Are you sure that the defendant whom you see in this courtroom is the individual you say shot Mr. Stanback and who robbed you at gun point at the counter?

Taylor: I could never forget the face because the way he pulled the trigger on my stomach. He kept trying to pull the trigger. I could never forget that face.

The second category of harmful questioning comprises 12 instances when the trial judge, in asking a question about the episode in the luncheonette, referred to the robber as "the defendant." Each instance occurred after one or more witnesses had identified the defendant as the robber. On the first occasion, Justice Roberts promptly corrected himself; after starting to say, "The defendant—," he quickly added, "withdrawn. A man with a gun." Nevertheless, during the course of the trial he asked several questions about "the defendant." When defense counsel objected on the twelfth use of this phrasing, the trial judge sustained the objection and rephrased his question to ask about "the man with the gun."

The third category of detrimental questioning comprises two instances in which the trial judge questioned the defendant in a challenging manner, revealing considerable skepticism about the defendant's testimony. First, the Judge probed Daye's account of how the person he claimed was the robber had moved past him to a position near the cook:

The Court: You saw a man pass by you?

Daye: Yes.

The Court: You were standing at "R" [a mark on a diagram indicating the location of a refrigerator]?

Daye: Yes.

The Court: The telephone is in front of you, correct?

Daye: In that area, yes.

The Court: The telephone is in front of you, correct?

Daye: In that area, yes.

The Court: Right?

Daye: Right.

The Court: How could a man pass by you—

Mr. Russo: Objection, Your Honor.

The Court: Overruled.

Mr. Russo: Exception.

The Court: Will you tell this court and jury if you're standing at "R" how a man can pass by you and then shoot the man at the telephone?

Now, you get off that stand and show how that can be done.

Second, the Judge cast doubt on Daye's claim—that he had fled out of fear of being wrongfully accused based on his previous presence at the scene of a crime—by developing the point that, on Daye's version of the facts, other patrons would have seen that he had been a victim of the crime:

The Court: And you were robbed?

Daye: Yes.

The Court: $40 had been taken from you?

Daye: Yes.

The Court: Correct?

Daye: Yes.

The Court: And when you placed $40 on the table there were other people sitting at the table where you placed the $40, correct?

Daye: I don't remember if people were sitting there or not.

The Court: People saw you there; isn't that correct?

Mr. Russo: Your Honor, may I have a continuing objection?

The Court: You have.

Were there people who saw you there?

Daye: I don't understand what you're trying to say.

The Court: You were there, there were other people there; there were other people in the E & D Luncheonette, weren't there?

Daye: Yes.

The Court: And you had taken $40 and placed it on the table?

Daye: Yes.

The Court: Right?

Daye: Yes.

The Court: And yet when the police came you ran?

### III.

In reviewing on direct appeal the conduct of federal criminal trials, this Court has been alert to instances of excessive and prejudicial intervention by trial judges, and we have exercised our authority to order new trials when circumstances warranted. *E.g., United States v. Fernandez,* 480 F.2d 726 (2d Cir.1973); *United States v. Nazzaro,* 472 F.2d 302 (2d Cir.1973); *United States v. Grunberger,* 431 F.2d 1062, 1067–68 (2d Cir. 1970); *United States v. Persico,* 305 F.2d 534, 540 (2d Cir.1962); *United States v. DeSisto,* 289 F.2d 833 (2d Cir.1961); *United States v. Brandt,* 196 F.2d 653, 655–67 (2d Cir.1952); *United States v. Marzano,* 149 F.2d 923, 925–26 (2d Cir.1945). The appellate courts of New York have been equally alert to their responsibilities and have not hesitated to order new trials when state trial judges have exceeded the bounds of proper conduct and intervened so extensively and prejudicially as to deny a defendant a fair trial. *E.g., People v. Yut Wai Tom,* 53 N.Y.2d 44, 422 N.E.2d 556, 439 N.Y.S.2d 896 (1981); *People v. Mees,* 47 N.Y.2d 997, 394 N.E.2d 283, 420 N.Y.S.2d 214 (1979) (mem.); *People v. DeJesus,* 42 N.Y.2d 519, 369 N.E.2d 752, 399 N.Y.S.2d 196 (1977); *People v. Tartaglia,* 35 N.Y.2d 918, 324 N.E.2d 368, 364 N.Y.S.2d 901 (1974) (mem.); *People v. Kelly,* 65 A.D.2d 686, 409 N.Y.S.2d 730 (1st Dep't 1978) (mem.); *People v. Ellis,* 62 A.D.2d 469, 404 N.Y.S.2d 862 (1st Dep't 1978) (per curiam).[1]

When assessing the extent and fairness of intervention by trial judges, New York and federal appellate courts are obliged to enforce constraints imposed by the federal Constitution. Under the Fifth and Fourteenth Amendments, criminal prosecutions must be conducted within the bounds of fundamental fairness, *see United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–1643, 36 L.Ed.2d 366 (1973); *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and we have no doubt that prejudicial intervention by a trial judge could so fundamentally impair the fairness of a criminal trial as to violate the Due Process Clause, *see Daye II, supra,* 696 F.2d at 196–97; *Johnson v. Metz,* 609 F.2d 1052, 1057 (2d Cir.1979) (Newman, J., concurring).

Constitutional issues need not be reached, however, when federal appellate courts consider on direct review claims of excessive intervention by federal trial judges. Instead, these appellate courts regularly rely upon their supervisory powers over the administration of federal criminal justice.[2] In reversing federal convictions because of prejudicial intervention by the trial judge, we have eschewed constitutional grounds

1. We note with dismay that in five of these New York cases, the trial judge was Justice Roberts, the same judge who presided over Daye's trial.

2. In *United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), the Supreme Court noted that separation-of-power considerations limited the federal judiciary's supervisory powers over investigative and prosecutorial activities that take place outside the courthouse. However, the Court recognized that federal courts retain supervisory powers over in-court activities, *id.* at 735 n. 7, 100 S.Ct. at 2446 n. 7, which include the conduct of the trial judge.

and have invoked instead the stricter standards appropriate to maintain "the high reputation of federal criminal justice," *United States v. Fernandez, supra,* 480 F.2d at 738; *see also id.* at 737 ("our notion of the proper role of a federal judge in a criminal trial"). Though we have characterized a federal trial judge's conduct as denying a "fair trial," *United States v. Nazzaro, supra,* 472 F.2d at 304, we were articulating the standard appropriate for the conduct of "a trial by jury in a federal court," *Quercia v. United States,* 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933).

Because trial judge intervention will exceed federal standards of judicial propriety before transgressing the limits of fundamental fairness required by the Constitution, federal courts have had little opportunity to delineate the constitutional bounds of trial judge intervention. It is only in reviewing a habeas corpus petition like Daye's that we must distinguish between the extent of trial court intervention that offends federal court standards and the more fundamentally unfair conduct that exceeds constitutional limits. The distinction reflects an important facet of federalism: federal courts have authority under their supervisory powers to oversee the administration of criminal justice within federal courts and lack such authority with respect to state courts.[3] The only commands that federal courts can enforce in state courts are those of the Constitution.[4]

The point is pertinently illustrated by cases facing the issue whether a criminal conviction should be reversed when a trial judge expresses to the jury his personal view that the guilt of the defendant has been proven beyond a reasonable doubt. "A federal judge," the Supreme Court has

held, may not do so, and when he does, the conviction must be reversed. *United States v. Murdock,* 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933). When the same issue arose with respect to a similar statement by a state trial judge, the Ninth Circuit, exercising habeas corpus jurisdiction, declined to grant the writ, first in a panel decision, *Gonsior v. Craven,* 449 F.2d 20 (9th Cir.1971), and later in another case decided by the full court, *Davis v. Craven,* 485 F.2d 1138, 1140 (9th Cir.1973) (en banc) ("We do not favor 'constitutionalizing'," and thus imposing on the states, the result reached in *United States v. Murdock.*"), *cert. denied,* 417 U.S. 933, 94 S.Ct. 2645, 41 L.Ed.2d 236 (1974). Whether constitutional standards of fairness are violated by a trial judge's statement to a jury that he believes the defendant has been proven guilty is a question on which reasonable judicial minds may and obviously do differ, as the seven-to-five division within the Ninth Circuit eloquently attests. *See id.* at 1142 (Goodwin, J., dissenting).

However we might rule on the *Davis v. Craven* issue if and when it is presented, it focuses attention on the considerations relevant to a decision whether the state trial judge's conduct in Daye's trial exceeded constitutional limits. When a trial judge gives his opinion of the defendant's guilt to a jury, two concerns arise. First, his statement creates a risk that the jury will be deflected from a conscientious discharge of their responsibility to find the facts, apply the law, and reach a fair verdict. The jurors may believe that they should shade their judgment to accommodate the judge's view of the defendant's guilt, perhaps deferring to his view in a close case. Second, even if the jurors are not swayed from an

---

**3.** This does not mean, as the dissent seems to apprehend, that a defendant in a state court is not entitled to a fair trial. On the contrary, a defendant in either state or federal court is entitled to a trial that comports with constitutional standards of fairness. It does mean, however, that a defendant in a federal court can secure additional protection against conduct amenable to a federal appellate court's supervisory power over the administration of federal criminal justice.

**4.** For purposes of this discussion we are not concerned with those infrequent instances in which Congress has undertaken to regulate by statute activities that affect the conduct of state criminal trials. *E.g.,* 18 U.S.C. § 2515 (1976) (precluding unlawful wiretap evidence in federal and state courts).

independent discharge of their solemn responsibilities, the judge's statement creates a risk that the trial will not be perceived by the defendant or the public as a fair adjudication of guilt or innocence, presided over by a neutral magistrate obliged to deal evenhandedly between the contending forces of the prosecution and the defense.

 A trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits. The number of questions asked by the judge is not determinative, as we have observed when reviewing the conduct of federal trial judges, *United States v. Fernandez, supra,* 480 F.2d at 736–37; *United States v. DeSisto, supra,* 289 F.2d at 834, though the degree of intervention provides the context in which the risks of adverse questioning should be assessed, *Johnson v. Metz, supra,* 609 F.2d at 1057 (Newman, J., concurring). Nor can the fact of some adverse questioning be determinative, because even the most neutrally framed questions, asked solely for clarification, may elicit answers devastating to the defendant. Moreover, a trial is not rendered constitutionally unfair every time a trial judge asks a question obviously intended to permit a witness to emphasize testimony helpful to the prosecution or clearly designed to challenge testimony favorable to the defense. At the same time we recognize that some point exists beyond which the quantity and nature of a trial judge's questioning renders a trial unfair in the constitutional sense.

 In Daye's case, the episodes of judicial intervention that we have recounted created some risk that some jurors might have thought that Justice Roberts was persuaded of the defendant's guilt. His hostile questioning of the defendant on two occa-

sions surely provides grounds for some apprehension on this score. His occasional questions asking about the "defendant" when an impartial questioner would have asked about the "robber" also created some risks. Moreover, his invitation to two witnesses to reenforce the strength of their identification testimony created a further danger that some jurors might perceive the trial judge not to be impartial.[5] Assessing these improprieties in the context of the total trial, however, we think they do not pose risks of sufficient gravity to warrant a conclusion that fundamental fairness has been denied. As we have noted, questioning by the trial judge that went beyond routine clarification occurred on only 29 of the 478 pages of witness examination, and his questioning that was detrimental to the accused, though ill-advised, was neither significantly helpful to the prosecution nor devastating to the defense. We believe that what occurred did not distract the jury from a conscientious discharge of their responsibilities to find the facts, apply the law, and reach a fair verdict. They were not told nor given a basis from which to infer that they ought to shade their judgment to accommodate what may well have been the judge's view of the defendant's guilt. Though the episodes of questioning we have recounted might have prompted some jurors to think that the trial judge was, in those instances, of assistance to the prosecutor, they did not convey the picture of a judge who had "enter[ed] the lists[, or] by his ardor induce[d] the jury to join in a hue and cry against the accused." *United States v. Marzano, supra,* 149 F.2d at 926. Nor was the overall conduct of the trial such that public confidence in the impartial administration of justice was seriously at risk.

In sum, we conclude that the trial judge's conduct approached but did not cross the line that permits us to rule that the Constitution has been violated. It is a matter of

---

**5.** Also in this vein, it was a departure from neutrality for the trial judge gratuitously to elicit from the defendant a disclaimer of being intoxicated on the day of the crime, thereby providing the prosecution with evidence to bolster the element of intent requisite for a murder conviction.

judgment, not demonstration. Though we share the criticisms of the trial judge expressed by Judge Lumbard in his dissenting opinion, we believe the improprieties did not deny the defendant the constitutionally mandated measure of fairness. The judgment of the District Court is therefore affirmed.

LUMBARD, Circuit Judge (dissenting):

I dissent.

I adhere to the views expressed in my dissenting opinion in *Daye I*, 663 F.2d at 1160–71. There I showed, by quoting from the transcript at considerable length, that the trial judge took over the trial, that he abandoned his role as a neutral arbiter for that of a prosecutor and that, as a result, Daye was deprived of his constitutional right to trial by jury. He received instead a trial by a biased judge.

Judge Newman's opinion implies that a federal court of appeals exercising its supervisory powers would not countenance such conduct by a federal trial judge. However, he holds that here "the trial judge's conduct approached but did not cross the line that permits us to rule that the Constitution has been violated." In other words, a trial that would be unfair and unacceptable in federal court is good enough in the state courts.

Until the announcement of such a distinction, I had understood that in a criminal case involving murder or any serious crime, whether it be in state or federal court, the defendant was entitled to a fair trial. The constitutional limits of this entitlement are not well illuminated by the majority's discussion of *Davis v. Craven*, 485 F.2d 1138 (9th Cir.1973) (en banc), *cert. denied*, 417 U.S. 933, 94 S.Ct. 2645, 41 L.Ed.2d 236 (1974). Regardless of how we would decide a case like *Davis* where the state judge had told the jury that he believed the defendant had been proven guilty, the judge's conduct here was much more prejudicial to the defendant. Here the judge engaged in a running argument with the defense, constantly emphasizing the prosecution's evidence and undermining the defendant's case. Thus,

the jurors were constantly reminded of the judge's opinion of Daye's guilt. Indeed, the judge dominated the proceedings to such an extent that the jurors must have begun looking for his next interruption and affirmation of the defendant's guilt, rather than independently assessing the evidence.

In any event I cannot agree with the majority's calculation that the trial judge's questioning went beyond "routine clarification" on "only 29 of the 478 pages of witness examination." What matters in a case like this is not only those remarks that were prejudicial in and of themselves, but also the judge's emphasis on crucial testimony which almost without exception underscored points favorable to the prosecution. As the following summary of a fraction of the court's interruptions shows, the court interrupted constantly not for the purpose of "routine clarification," but to build the prosecution's case:

The judge interrupted on at least nineteen pages of transcript to emphasize that the robber wielded a gun, shot the cook, attempted to pull the trigger while pointing at others, and struck an old man on the head with the gun, Tr. 46–48, 54–55, 67, 153, 156, 158–59, 199, 250, 300, 337–39, 341, 582, 586; on eight pages to emphasize laboratory evidence that the gun found near Daye was the gun that fired the fatal bullet, Tr. 503–07, 512, 514–15; on six pages to emphasize that the gun had an unusual appearance and that a mistaken identification was unlikely, Tr. 55, 279, 308–09, 493–94; on four pages to help a police witness explain why none of Daye's fingerprints were found on the gun, Tr. 480–81, 484–85; on at least two pages to emphasize the police recovery of the gun in evidence, Tr. 406, 434; on four pages to emphasize the implausibility of, or to challenge directly, Daye's claim that he had randomly picked the apartment to which he had run after the robbery, Tr. 570, 589–91; on five pages to emphasize evidence that a wallet stolen in the robbery was found near the same apartment, Tr. 65, 191, 276–77, 454; on ten pages to elicit testimony undermining a possible defense of intoxication or drug

overdose, Tr. 386–91, 574, 600–02; on nine pages to reinforce eyewitness identifications, Tr. 61–62, 115–16, 131–32, 134, 266, 330; on five pages to undermine the defense claim that another victim, Tr. 68, 120, 257, 322, 476; on four pages to reinforce testimony that Daye was apprehended wearing the same clothing the robber had been seen wearing, Tr. 150, 266–67, 463; on two pages to argue the physical impossibility of Daye's version of the robbery, Tr. 583–84; and on three additional pages to express his unveiled incredulity concerning Daye's defense, Tr. 592–94, *see also* 598. On the remaining two hundred pages on which Judge Roberts interrupted, he asked no questions tending to support the defense.

Thus, on approximately 80 pages of transcript, the judge asked hundreds of questions adverse to the defendant. Against this relentless onslaught, defense counsel was powerless. He could do nothing but record his objections. It is absurd to suppose that such damage can be repaired by simply reminding the jury that the decision is theirs. Had anyone familiar with criminal trials entered the courtroom in June 1976 and tarried there for only fifteen minutes, he would have concluded that the judge was railroading the defendant to certain conviction. Today, this court decides that the Constitution is no protection against this mockery of a trial by jury.

No matter how despicable may be the record of a defendant; no matter how clear his guilt may seem, that defendant, like all of us, enjoys all the rights accorded by our Constitution to and throughout a trial by jury, as one presumed to be innocent until the jury has found him guilty. Thus, the question whether a defendant like Daye will be accorded a fair trial, as he faces possible life imprisonment, is a fundamental test of our commitment to due process under a Constitution administered according to law by impartial judges and unbiased juries. The question of guilt is not for this court, nor was it for Judge Roberts. The question was for the jury to decide after the defendant had had a fair trial. Believing as I do that Daye did not have a fair trial, I would grant the writ.