727 F.2d 222
 Jesse JOHNSON and Cynthia Hall, Petitioners-Appellees,
v.
Charles J. SCULLY, Warden, Greenhaven Correctional Facility,
and Phyllis Kurrly, Correction Superintendent,
Bedford Hills Correctional Facility,
Respondents-Appellants.
 No. 237, Docket 83-2162.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 13, 1983.
Decided Jan. 27, 1984.
 
 Shulamit Rosenblum, Asst. Dist. Atty., Brooklyn, N.Y. (Elizabeth Holtzman, Dist. Atty., and Barbara D. Underwood, Asst. Dist. Atty., Brooklyn, N.Y., on brief), for respondents-appellants.
 Jeffrey A. Rabin, Brooklyn, N.Y., for petitioners-appellees.
 Before KAUFMAN, NEWMAN and DAVIS,* Circuit Judges.
 JON O. NEWMAN, Circuit Judge:
 This is, we trust, the final chapter in a saga that well illustrates the difficulties of according due recognition to the prerogatives of state courts when state prisoners seek to vindicate their constitutional rights by seeking a federal writ of habeas corpus. A visitor from another country, even most citizens of this country, would scarcely believe the procedural history of this case. As the patient reader will discover, there is now presented for decision by this Court the substantive issue whether the conduct of the state judge who presided at the trial of petitioners Jesse Johnson and Cynthia Hall in 1973 exceeded the bounds of fairness mandated by the Due Process Clause of the Fourteenth Amendment, an issue first sought to be presented to this Court in 1979. Even now, eleven years after the trial and five years after petitioners first brought their claim to this Court, the prosecutors representing the State of New York urge us not to rule on the merits of the claim, suggesting that the claim has been brought either too soon or too late. For the reasons that follow, we conclude that this is the time to decide the merits and that the conduct of the state court trial judge, though disquieting in several respects, did not transgress constitutional standards.
 I. Procedural History
 Johnson and Hall were convicted in 1973 after a jury trial in New York State Supreme Court (Aaron Koota, Justice) on charges of criminal possession and sale of heroin. The Appellate Division affirmed without opinion, 46 A.D.2d 739, 361 N.Y.S.2d 325 (2d Dep't 1974), leave to appeal to the New York Court of Appeals was denied on February 4, 1975, and the United States Supreme Court denied certiorari, 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975). In 1976 petitioners filed a petition for a writ of habeas corpus in the District Court for the Eastern District of New York. Ultimately a hearing was held, and on February 5, 1979, the District Court (Edward R. Neaher, Judge) granted the writ. Johnson v. Metz, No. 76-442 (E.D.N.Y.1979), reprinted in Johnson v. Scully, 563 F.Supp. 851, 860-876 (Appx. A) (E.D.N.Y.1982). In a carefully considered opinion Judge Neaher concluded, from his examination of the state court trial transcript, that the trial judge "so far exceeded his permissible role" as to deny petitioners "a fundamental element of due process." Id. at 873.
 Upon the State's appeal, this Court reversed, accepting the prosecutor's argument that petitioners had failed adequately to exhaust their state court remedies. Johnson v. Metz, 609 F.2d 1052 (2d Cir.1979) (Johnson I ). We ruled that the claim of prejudicial conduct by the trial judge had been presented to the state appellate courts as a violation of state law or a matter calling for the exercise of the state courts' exercise of their supervisory power, rather than as a violation of the federal Constitution. Though petitioners had specifically called to the attention of the state courts the instances of conduct by the trial judge that they claimed were fundamentally unfair, we ruled their papers insufficient to alert the state courts to the federal nature of their complaint. Writing the principal opinion for the panel, Judge Gurfein recognized the potential problem presented by section 440.10(2)(c) of the New York Criminal Procedure Law (McKinney 1971), which requires a state court judge to deny a motion to vacate a judgment of conviction sought on an issue that a defendant unjustifiably failed to raise on direct appeal, if the record underlying the judgment contained sufficient facts to have permitted adequate review of the issue. Noting uncertainties concerning the construction New York courts would give this provision, Judge Gurfein wrote, "It is difficult for this panel to believe, however, that no post-conviction remedy whatever will be available by way of state collateral relief when a serious federal constitutional issue is involved." 609 F.2d at 1056. The writer of this opinion concurred, expressing the view that petitioners' claim was being returned "for what will surely be sensitive examination by the state courts." Id. at 1057 (Newman, J., concurring).
 
 
 1
 Petitioners then filed in the New York Supreme Court a motion to vacate their convictions, pursuant to N.Y.C.P.L. Sec. 440.10. The motion was denied solely on the procedural ground that petitioners had failed to raise their claim as a federal claim on their original direct appeal. Leave to appeal from that ruling was denied.
 
 
 2
 Petitioners returned to the District Court, no doubt confident that their second attempt to secure relief from the state courts would overcome the exhaustion barrier to the federal courthouse and entitle them to a ruling on the merits. The District Court, with evident reluctance, rejected their claim on procedural grounds. Johnson v. Scully, No. 81-8163 (E.D.N.Y. June 25, 1982), reprinted in Johnson v. Scully, supra, 563 F.Supp. at 881-82 (Appx. C). Relying on Forman v. Smith, 633 F.2d 634 (2d Cir.1980), cert. denied, 450 U.S. 1001, 101 S.Ct. 1710, 68 L.Ed.2d 204 (1981), the Court ruled that petitioners' failure to raise a federal claim on their direct appeal from their conviction amounted to a forfeiture of that claim under the rule of Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and that no "cause" had been shown that would warrant relief from that forfeiture. The Court felt constrained to rule that the federal claim had not been presented on direct appeal, not only by our prior decision in Johnson I but also by the subsequent decision in Daye v. Attorney General, 663 F.2d 1155 (2d Cir.1981) (Daye I ).
 
 
 3
 Thereafter, this Court reconsidered Daye I en banc and announced a somewhat more relaxed standard for determining what constitutes an adequate presentation of a federal claim to a state court to satisfy exhaustion requirements. Daye v. Attorney General, 696 F.2d 186 (2d Cir.1982) (en banc) (Daye II ). Upon petitioners' appeal of the District Court's ruling dismissing their petition on forfeiture grounds, a panel of this Court remanded for reconsideration by the District Court in light of Daye II. Johnson v. Scully, 714 F.2d 114 (2d Cir.1982) (table). Upon remand, Judge Neaher found that, under the standards of Daye II, petitioners had, after all, adequately presented their federal claim on their original state court direct appeal to satisfy exhaustion of state court remedies. Johnson v. Scully, supra, 563 F.Supp. at 852-59. The District Judge noted, id. at 859, that petitioners were confining their habeas corpus petition solely to the claim that the state trial judge's conduct had denied them a fair trial, and that other claims presented in their petition had been withdrawn, thereby satisfying the requirements of Rose v. Lundy, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). See Rock v. Coombe, 694 F.2d 908, 914 (2d Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1773, 76 L.Ed.2d 345 (1983). Judge Neaher then reached the merits of the due process claim and reaffirmed his view that a fair trial had been denied, for the reasons set forth in his 1979 decision. Johnson v. Scully, supra, 563 F.Supp. at 859-60. Petitioners were ordered released unless the State elected to retry them. Johnson remains in custody pursuant to a federal conviction obtained in 1978. Hall is at liberty on parole, her sentence of fifteen years to life having been commuted.
 
 
 4
 In pressing its appeal, the State asserts that petitioners did not adequately present their due process claim on their original direct appeal of their convictions to satisfy exhaustion requirements and that their failure to do so works a forfeiture under Wainwright v. Sykes, supra. The State acknowledges, however, that under the principles set forth in Daye II petitioners' state court remedies had been exhausted; its dispute is with the standards enunciated by the en banc court. We agree with Judge Neaher that state court remedies had been exhausted on petitioners' original state court direct appeal, according to the standards of Daye II. We therefore need not consider the State's contention that if a claim is presented to a state court on direct appeal but not then sufficiently identified as a federal claim to satisfy the exhaustion requirement, it is forfeited unless the "cause" and "prejudice" test of Sykes is met. We can safely leave for another day whether we are required to apply the forfeiture rule that strictly. We therefore come, at last, to the merits.
 
 II. The Merits
 
 5
 The conviction of petitioners stemmed from an uncomplicated transaction in which Johnson, apparently with Hall's assistance, sold three-quarters of a kilo of heroin to an undercover police officer for $23,000. A police informant introduced the undercover officer to Johnson, who agreed to make the sale. Subsequently the officer met Johnson, showed him $23,000 contained in a green knapsack, and placed the knapsack in Johnson's car. Johnson was observed driving to an apartment house that he sometimes shared with Hall, his girl friend. Johnson was observed entering the building with a brown paper bag and, shortly thereafter, coming out accompanied by Hall, who carried the green knapsack over her shoulder. Hall disputed that she carried the knapsack from the building, but conceded that Johnson gave it to her in the car. She testified that Johnson told her to wait at the Centaur Bar, a neighborhood tavern, and give the knapsack to the informant, whom she knew as Pete Knight. Hall complied, and the knapsack was retrieved by Knight and an undercover policewoman, who brought it to Johnson's customer, the undercover officer. The knapsack, which had contained the $23,000, now contained two packages of heroin.
 
 
 6
 At trial Johnson, who did not testify, endeavored to assert that he was not selling to the undercover officer but only acting as his buying agent, and also that he was the victim of entrapment. Hall denied any knowledge that the knapsack contained heroin.
 
 
 7
 As Judge Neaher noted in his meticulous review of the transcript, the state court trial judge played an unusually active role in the trial. He asked more questions than either the prosecutor or the defense attorneys. He took over the questioning of the State's first witness, the undercover police officer, for no apparent reason and frequently asked each of the State's witnesses to repeat aspects of their testimony damaging to the defendants. The trial judge also needlessly emphasized the prosecution's view of the relevance of its evidence, often discussing the evidence and the ground of its admissibility at great length in the presence of the jury, despite defense counsel's vain pleas for discussions at side bar.
 
 
 8
 Of special concern to Judge Neaher was the trial judge's conduct during the direct testimony of Hall. He frequently interrupted her counsel's effort to elicit her version of the events, posing a series of questions that reviewed minute details of what had transpired at the meeting in the Centaur Bar. More disturbing was his direct challenge to Hall's claim of innocence, conveyed in this question:
 
 
 9
 The Court: Miss Hall, when Mr. Johnson gave you the knapsack and told you to go into the Centaur Bar and give it to Pete Knight, weren't you curious at all about what was in the knapsack?
 
 
 10
 The Witness: No.
 
 
 11
 The Court: Next question, please.
 
 
 12
 Also damaging to Hall's defense was the trial judge's questioning of her concerning her knowledge of items seized by police pursuant to a search warrant from the apartment she shared with Johnson. The items included glucose, a scale, and a plastic bag containing white powder. The prosecution had been denied the opportunity to offer these items on its direct case as probative of Johnson's predisposition. The trial judge had ruled that the items were of doubtful admissibility and prejudicial. However, the prosecution asserted a new claim to the admission of these items when Hall, on cross-examination probing her claimed lack of knowledge of the contents of the knapsack, denied any knowledge that Johnson kept narcotics in the apartment or that she had seen mixing materials for heroin being taken out of the kitchen closet. At that point the prosecution claimed the right to offer the seized evidence to contradict Hall's denials. The trial judge ruled that Hall could be questioned about her knowledge of the seized items, but that the items themselves could not be received in evidence. The trial judge told counsel and then the jury that he would personally question Hall about her knowledge of the seized items "to avoid any possibility that the district attorney may inadvertently ask the wrong kind of a question and then create a problem ...." In response to the Court's questions, Hall admitted knowledge of the seized items; she offered the explanation that she used the glucose with milk as a substitute for sugar, that the white powder in the plastic bag was flour, and that the scale had been in the apartment when she and Johnson first moved in and had never been used. The judge barred the prosecutor from any further questioning concerning these items.
 
 
 13
 The District Court also faulted the trial judge for giving the jury an unbalanced summary of the prosecution and defense contentions in the instructions. The prosecution's theory of the case and its evidence were recounted at length. Defense contentions were set forth briefly and to some extent accompanied by the answering contentions of the prosecution. A particularly pointed adverse remark was made in the midst of informing the jury that it could consider Hall's living arrangement with Johnson as bearing on her credibility:
 
 
 14
 The Court: Do you regard her admission that she was being kept by defendant Johnson as an act of moral turpitude? Do decent, normal people carry on that way?
 
 
 15
 Finally, the District Court noted that the entire trial was punctuated by sharp exchanges between the trial judge and defense counsel, with defense counsel frequently rebuked in the presence of the jury.
 
 
 16
 We recently considered the somewhat ill-defined standards to be applied when a federal habeas corpus court is asked to determine whether the conduct of a state court trial judge has denied a criminal defendant the constitutionally mandated measure of fairness. Daye v. Attorney General, 712 F.2d 1566 (2d Cir.1983) (Daye III ). Daye III, decided following the en banc ruling on exhaustion of state court remedies in Daye II, was announced long after Judge Neaher made his initial ruling on the merits of this case in 1979 and two months after he reconfirmed that ruling in the decision now on appeal. We identified as principal concerns the risk that the jury might be "swayed from an independent discharge of their solemn responsibilities" and that "the trial will not be perceived by the defendant or the public as a fair adjudication of guilt or innocence, presided over by a neutral magistrate obliged to deal evenhandedly between the contending forces of the prosecution and the defense." Daye III, 712 F.2d at 1571-72. However, we noted that the constitutional standard is not transgressed as readily as the standards used by both federal and state appellate courts in exercising their supervisory authority over the administration of criminal justice within their respective jurisdictions. Id. at 1570-71. We concluded:
 
 
 17
 A trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits.
 
 
 18
 Id. at 1572.
 
 
 19
 After careful review of the 2,713 pages of transcript from the state court trial, we conclude that the trial judge's conduct did not exceed constitutional standards. His questioning of witnesses was extensive but, in the main, not adverse to the defendants. Only with respect to the first witness, the undercover officer, did the trial judge undertake extensive questioning to elicit new matter that would better have been left for development by the prosecutor. Such questioning occurred on 60 pages of the officer's testimony. Questions to clarify the officer's answers occurred on 198 pages. A few of these questions afforded the officer an opportunity to repeat damaging testimony, though little of what he said was in dispute. With respect to the prosecution's eight other witnesses, questions by the judge eliciting new evidence occurred on 20 pages, and some of these were simply expeditious means of establishing undisputed identifications of the defendants by the witnesses. Clarifying questions of these eight witnesses occurred on 89 pages.
 
 
 20
 For the most part, the questions the trial judge asked Hall, the only defense witness, were clarifying. These occurred on 26 pages. The only questions to Hall of a damaging nature were the ones previously mentioned--the highly suggestive query as to her lack of curiosity about the contents of the knapsack and the elicitation of her knowledge of the items seized from the apartment. Both episodes are troublesome. A trial judge is surely well-advised to refrain from any challenging questioning of a defendant, especially a question that blatantly reflects his own disbelief of the essence of the defense. The questioning about the seized items appears to have been motivated by concern that the prosecutor might venture into impermissible areas that could be avoided by brief, direct questions from the judge. Though the judge explained his concern to the jurors and cautioned them not to attribute any significance to the fact that he was asking these questions, there was inevitably some risk that jurors might think the judge was coming to the prosecution's rescue toward the end of the trial by confronting Hall with significant evidence that had not been in the case up to that point.
 
 
 21
 The jury instructions dwelled heavily on the prosecution's claims and evidence, but that was partly attributable to the fact that most of the evidence was presented by the prosecution. The marshalling of evidence is not subject to an equal time requirement, though the trial judge could surely have found more neutral ways to set forth the prosecution and defense contentions. The remarks to counsel throughout the trial were in large part provoked by counsel themselves, and the judge's displeasure was directed at the prosecutor as well as the defense attorneys.
 
 
 22
 On balance it may safely be said that the trial judge strayed a considerable distance from the model of a neutral magistrate. His interventions in the trial were far more extensive than what is normally appropriate for a trial judge endeavoring to expedite proceedings and assist the jury's understanding. And there were some instances of pro-prosecution questioning and comment, as we have noted. Judge Neaher reached an entirely understandable conclusion in assessing the trial judge's conduct as constituting a denial of due process. Our conclusion, however, is to the contrary. As in Daye III, we think that in this case "the trial judge's conduct approached but did not cross the line that permits us to rule that the Constitution has been violated." 712 F.2d at 1572.
 
 
 23
 The judgment of the District Court is reversed and the cause remanded with directions to enter judgment for the respondents-appellants.
 
 
 
 *
 The Honorable Oscar H. Davis of the U.S. Court of Appeals for the Federal Circuit, sitting by designation