Robert WALBERG,
Petitioner-Appellant,

v.

Thomas ISRAEL, Respondent-Appellee.

No. 84–2435.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 20, 1985.

Decided July 1, 1985.

Wesley E. Brown, Senior District Judge, sitting by designation, filed dissenting opinion.

record, and in view of our disposition of this case, we deny the EPA's motion to strike.

William J. Tyroler, Wis. State Public Defender, Milwaukee, Wis., for petitioner-appellant.

Christopher Wren, Asst. Atty. Gen., Wisconsin Dept. of Justice, Madison, Wis., for respondent-appellee.

Before CUDAHY and POSNER, Circuit Judges, and BROWN, Senior District Judge.*

POSNER, Circuit Judge.

In this habeas corpus proceeding, Robert Walberg, who was convicted of burglary by a jury in a Wisconsin state court and sentenced to 28 years in prison, argues that his federal constitutional rights to effective assistance of counsel and to trial by an unbiased tribunal were violated. The district court disagreed, 587 F.Supp. 1476 (E.D.Wis.1984), as had the Wisconsin Supreme Court, *State v. Walberg,* 109 Wis.2d 96, 325 N.W.2d 687 (1982), and denied the petition for habeas corpus.

In this court the state argues for the first time that Walberg failed to exhaust his state remedies before seeking federal habeas corpus. The circuits are divided over whether the defense of failure to exhaust state remedies can be waived. See *Purnell v. Missouri Dept. of Corrections,* 753 F.2d 703, 708-10 (8th Cir.1985); Comment, *State Waiver and Forfeiture of the Exhaustion Requirement in Habeas Corpus Actions,* 50 U.Chi.L.Rev. 354 (1983). *Heirens v. Mizell,* 729 F.2d 449, 457 (7th Cir.1984), a decision of this court, holds that it can be, although an earlier decision of the court, *Mattes v. Gagnon,* 700 F.2d 1096, 1098 n. 1 (7th Cir.1983), had implied the contrary. It might seem that whether or not the language of the habeas corpus statute makes exhaustion a precondition to the exercise of federal jurisdiction to decide the merits of the petition (habeas corpus "shall not be granted [to a state prisoner] unless it appears that the applicant has exhausted the remedies available in the courts of the State ...," 28 U.S.C. § 2254(b)), considerations of comity and federalism should make a federal court determine on its own initiative whether the petitioner has exhausted his state remedies, even if the state attorney general is less zealous in protecting the prerogatives of his state's courts than he ought to be. The state is not a person; it is a collective; and the state attorney general—normally an elected official—may not be speaking for the whole of state government.

An alternative approach, argued in Judge Higginbotham's concurring opinion in *Felder v. Estelle,* 693 F.2d 549, 545-55 (5th Cir.1982), and adopted in *McGee v. Estelle,* 722 F.2d 1206, 1212 (5th Cir.1984) (en banc), is to ask whether the state attorney general is authorized under state law to waive the requirement of exhausting state remedies. The idea behind this approach is that to override the state's own decision on the allocation of state governmental powers would disserve the very interests in comity and federalism on which a rule forbidding waiver would have to rest.

But we need not get deeper into this thicket. Even if the defense of failure to exhaust state remedies cannot be waived, either explicitly or (as here) by being asserted belatedly, we find that Walberg presented to the state courts essentially the same claims he makes in this habeas corpus proceeding, and we therefore conclude that he did exhaust his state remedies and that we must decide the merits of his claims.

Those claims are rooted in the angry and injudicious manner in which Judge Christ T. Seraphim, who presided at Walberg's trial, conducted himself, especially in the pretrial phase of the case. This behavior, similar behavior in other cases, sexual misconduct, and in one case accepting gifts

---

* Hon. Wesley E. Brown of the District of Kansas, sitting by designation.

from a litigant, earned Judge Seraphim a three-year suspension by the Wisconsin Supreme Court. See *In re Seraphim,* 97 Wis.2d 485, 294 N.W.2d 485 (1980). In the present case, his ire was focused on Walberg's lawyer, Donald Clark, whom Judge Seraphim had appointed to defend Walberg, an indigent. During a hearing on a motion to suppress a statement that Walberg had made to the police while in custody, Judge Seraphim became irritated at what he considered Clark's wasting the court's time by asking too many questions and making too many motions and objections in a cause the judge considered unworthy. The judge said to Clark, "if I were to leave it to you the police would never be able to arrest anybody." The judge criticized a prosecution witness at the suppression hearing who unexpectedly gave testimony favorable to the defense, and told the witness that a previous witness had given contrary testimony; yet the judge had granted the prosecutor's motion to separate the witnesses (that is, to exclude all but the testifying witness from the courtroom), so that a witness would not try to mold his testimony to that of a previous witness. The judge ridiculed Walberg's testimony that the police hadn't let him go to the bathroom while he was being interrogated. And here is the end of Clark's examination of Walberg, where the judge answered the questions before Walberg could do so, to show how predictable his answers were:

Q While you were being interrogated, Mr. Walberg, were you tired?

THE COURT: Yes.

THE WITNESS: Yes.

THE COURT: Sure.

A [By Clark] Were you well rested?

THE COURT: No.

THE WITNESS: No.

THE COURT: I know. I can answer those questions, Mr. Clark, as you are asking them. They are obvious answers.

Q [by Clark] What was your mental frame of mind during this interrogation?

THE COURT: Disturbed, worried.

THE WITNESS: No, more disgusted than anything else, Your Honor.

MR. CLARK: Nothing further.

Clark complained that during a recess at a later pretrial hearing Judge Seraphim told him, "I am going to fix you on the trial of this case." This incident (not transcribed) led Clark to move the judge to recuse himself. The judge exploded:

I have now made arrangements, Mr. Clark, and I am ashamed or you, the man who came to me and asked me to put him in a law office, which I did, ... and ... you thank me for. I put you, when you graduated, into the District Attorney's Office and kept you there.... I have appointed you in this case. I'm a good friend of your mother's, a good friend of your sister's and I was a good friend of your father's.

The judge added that he would "show no prejudice to this defendant. He's going to get a fair trial." The judge told Walberg he had "no personal personal prejudice against you." Later he repeated that Walberg would get a fair trial—"but not if you [Clark] keep bringing motions, I will tell you this." And he said, "don't ever come to me with your bill on this thing, because I am not going to pay for all these motions [to recuse him] you are bringing up in the Supreme Court." The judge concluded the hearing by saying, "I will never waste the taxpayers' money again. I assure you."

The case proceeded to trial, and when the jury returned guilty verdicts on both counts Judge Seraphim told the jury: "I accept the verdicts, you could have found no other verdict.... It's to your credit that you came back as fast as you did with these verdicts." He then imposed sentence on the spot, rejecting Clark's request for a continuance. Although the legislature had recently reduced the maximum sentence for possession of burglar's tools from 10 to 2 years, Judge Seraphim sentenced Walberg (who had committed the crime before the reduction in the maximum sentence) to 9 years on that count, plus 5 years' enhancement because of Walberg's prior criminal record. On the other count, bur-

glary, the judge sentenced Walberg to 9 years plus 5 years' enhancement. The judge made the sentences on the two counts consecutive to each other and to a parole revocation, so that Walberg is facing 31 years in prison, though under Wisconsin law he will be eligible for parole after he has served one year on each of the sentences, and if he behaves himself in prison will be entitled to release (as distinct from merely eligible for parole) in about 14 years.

■ The sentences were legal, and defensible in light of Walberg's very long record of burglaries; Judge Seraphim did not misbehave during the trial; his animus was directed against Walberg's lawyer rather than against Walberg; and the evidence of Walberg's guilt was overwhelming—one of the people who lived in the apartment that Walberg burgled was in the apartment at the time and identified Walberg, who moreover admitted his participation in the burglary to the police (and the admission was in evidence). It seems, then, that however antically Judge Seraphim behaved in the pretrial proceedings, and however harsh he may have been in his sentencing of Walberg, any error in his conduct of the case was harmless; and it was on this ground that the Wisconsin Supreme Court held that Walberg's constitutional rights had not been violated.

■ But there are limitations to the doctrine of harmless error that persuade us that the doctrine cannot be used to deny Walberg the relief that he seeks in this habeas corpus proceeding. If the police, after arresting Walberg and obtaining an eyewitness identification of him plus his confession, had taken him directly to the penitentiary on the ground that a trial would be a waste of time for someone so patently guilty, he would be entitled to release on habeas corpus; he would have been deprived of his liberty without due process of law. The Constitution requires (unless the defendant waives his rights) a certain modicum of adversary procedure even if the outcome is a foregone conclusion because the evidence of guilt is over-

whelming. Although the present case is much less extreme than the hypothetical case just put, we think Walberg was so far impeded in his ability to defend himself effectively that he is entitled to a new trial, or to be released if the Wisconsin authorities don't want to retry him, even though his guilt is plain and his sentence was legal. We do not rest this conclusion on grounds of due process, however; we think the state court deprived him of his constitutional right to the assistance of counsel.

Under the public-defender system in force in Wisconsin when Walberg was tried, the trial judge appointed defense counsel for indigents. So lawyer Clark owed his appointment to Judge Seraphim, and in addition had to get Judge Seraphim's approval of his fee for defending Walberg (the record does not reveal whether the judge ever did approve Clark's fee). The judge would also have it in his power to give, or not to give, Clark a subsequent appointment. Although some lawyers accept appointments to defend indigents purely out of a sense of *noblesse oblige*, or to get experience, rather than out of a desire for a fee, Clark is apparently not one of these lawyers, at least if we may judge from the judge's accusation of ingratitude. After the judge's pretrial outburst Clark knew that he would have to be on his best behavior at trial if he was to have any hope of a subsequent appointment by Judge Seraphim—and perhaps if he was to have any hope of getting paid for defending Walberg. And Judge Seraphim had indicated that good behavior meant not just avoiding unethical conduct but also not pressing too hard, even well within ethical boundaries, in favor of an obviously guilty defendant. Although there is no proof that Clark pulled his punches at trial, he had every incentive to do so. He had a conflict of interest, not between two clients having conflicting defenses but between his client and himself. They had conflicting incentives—Walberg to get off by any means, Clark to preserve so far as possible his relationship with a judge who regarded

himself, apparently with some basis, as Clark's benefactor.

Of course it is implicit in any system where trial judges appoint counsel who receive fees—indeed in any system where judges rule on attorney's fees, whether or not the judge appointed counsel—that counsel has an economic incentive to comply with the judge's wishes, and this may at times create a division of loyalties. We do not for a moment suggest that a lawyer appointed under such a system is therefore incapable of representing his client in a constitutionally adequate fashion. But in extreme cases a fatal conflict of interest may arise. Suppose Judge Seraphim had told Clark that if he defended Walberg vigorously he would never get another appointment. Such a threat would entitle Walberg to a new trial regardless of whether a vigorous defense could have gotten him off. The judge did not go quite so far, but he went far. He accused Clark of ingratitude; he made a thinly veiled threat not to approve Clark's fee request at the end of the trial; he reminded Clark of Clark's dependence on his goodwill. The circumstances made the conflict of interest between Clark and his client too serious to be excused just because Walberg cannot show what more Clark would have done in Walberg's defense. (Walberg could have called Clark to testify as a witness in the habeas corpus proceeding, but did not; so we must assume that he would not have given testimony helpful to Walberg's present claims.)

■ Although the general rule is that a criminal defendant who claims ineffective assistance of counsel must show not only lack of minimum professional competence but also that the lack probably changed the outcome of his trial, see *Strickland v. Washington,* — U.S. ——, 104 S.Ct. 2052, 2067–68, 80 L.Ed.2d 674 (1984), there are important exceptions relating to conflicts of interest. When the defense lawyer is guilty of a conflict of interest to which no objection was made at trial, the defendant, though he must show that the conflict adversely affected the trial, need not show

that the trial would probably have come out differently if there had been no conflict. See *id.* at 2067; *Cuyler v. Sullivan,* 446 U.S. 335, 345–50, 100 S.Ct. 1708, 1716–19, 64 L.Ed.2d 333 (1980). But if an objection had been made, the defendant would be entitled to a new trial even if the conflict of interest had had no effect at all on the trial. See *Holloway v. Arkansas,* 435 U.S. 475, 487–91, 98 S.Ct. 1173, 1180–82, 55 L.Ed.2d 426 (1978). The principle is not limited to cases where the conflict of interest is between clients; it reaches a conflict between the client and the lawyer's personal interests, as well. *Solina v. United States,* 709 F.2d 160, 167–69 (2d Cir.1983) (Friendly, J.), holds that if the defendant is represented by someone who (unbeknownst to the defendant) is not a lawyer, there is a per se violation of the right to assistance of counsel. See also *United States v. Hoffman,* 733 F.2d 596, 599–600 (9th Cir.1984) (dictum). With some of the reasoning in Judge Friendly's opinion and perhaps even with the application of the principle he announced to the facts of his case it is possible to differ; but what is significant for present purposes is his suggestion that an imposter lawyer might fear that if he defended his client too vigorously it would draw attention to himself, and he might be unmasked, see 709 F.2d at 164–65—that there was in short a conflict between the client's and the lawyer's interests. In another Second Circuit case, *United States v. Cancilla,* 725 F.2d 867, 869–71 (2d Cir. 1984), where the defendant's counsel was engaged in criminal conduct similar to what his client was accused of, the court held that the conflict of interest was fatal; no actual impact on the defense had to be shown. No objection had been made at trial—but then the defendant had not known of his lawyer's criminal activities. See also *Government of Virgin Islands v. Zepp,* 748 F.2d 125, 135–39 (3d Cir.1984).

■ Clark moved to recuse Judge Seraphim on the ground that "if this case should proceed with Judge Seraphim presiding defendant will be denied the effective assistance of counsel"; and with the

judge thus alerted to the conflict, maybe his refusal to recuse himself was reversible error even if harmless, under the cases we have cited. But there is no need to pursue this approach further; no need to decide whether Clark should have done more—should have moved for leave to withdraw as Walberg's counsel—in order to bring the case within the orbit of cases where objection was made to the alleged conflict of interest. Although both parties describe Walberg's claim as one of ineffective assistance of counsel, the description is imprecise. The essence of such a claim, and one of the reasons the courts have made it so difficult for defendants to prevail on it, is that it asks the courts to set aside a conviction not because of any impropriety by the prosecution or the trial court but merely because the defendant's lawyer was not up to snuff. When the state, here in the person of the trial judge, "interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense," *Strickland v. Washington, supra,* 104 S.Ct. at 2064, we are in a different ballpark. If the state is not a passive spectator of an inept defense, but a cause of the inept defense, the burden of showing prejudice is lifted. It is not right that the state should be able to say, "sure we impeded your defense—now prove it made a difference." It is enough that Judge Seraphim by his threats to Clark appreciably reduced the likelihood that Clark would conduct a vigorous defense. Compare *United States v. Cronic,* —— U.S. ——, 104 S.Ct. 2039, 2047 n. 25, 80 L.Ed.2d 657 (1984); *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); *Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975); *Siverson v. O'Leary,* 764 F.2d 1208, 1217 (7th Cir.1985). This notion of impedance may, of course, lie behind the refusal to disregard harmless error when the defendant is forced against his will to be jointly represented with other defendants. But whether or not this case fits the precise mold of the *Holloway* case it involves the same policy, one of protecting defendants

against gratuitous interference by the judge with their efforts to defend themselves.

From this discussion it should be clear that our conclusion that Walberg was denied his constitutional right to counsel is not based on any disagreement with the factfindings made by the Wisconsin court in rejecting his claim—findings that come to us with a presumption of correctness, see 28 U.S.C. § 2254(d); *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981)—or by the district court in denying habeas corpus. The disagreement is over whether Walberg's claim must fail because he cannot show how Clark would have defended him differently but for Judge Seraphim's threats. We respectfully suggest that that is the wrong standard.

█ It is possible but less certain that Walberg was also deprived of a far older right than the right to the effective assistance of counsel—the right to an unbiased judge. Although most cases of bias by trial judges have involved the question whether the judge's bias was likely to influence the jury, that is not an essential element. Even when the biased judge neither is the trier of fact nor is shown to have conveyed his bias to the jury that is the trier of fact, there can be a violation of due process which requires a reversal of the conviction. *United States v. Holland,* 655 F.2d 44, 47 and n. 5 (5th Cir.1981) (per curiam); *United States v. Brown,* 539 F.2d 467, 468–70 (5th Cir.1976) (per curiam); cf. *Daye v. Attorney General,* 696 F.2d 186, 197 (2d Cir.1982) (en banc); *Johnson v. Scully,* 727 F.2d 222, 226 (2d Cir.1984). This is implicit in cases which hold that a judge who has a pecuniary interest in the outcome of a case cannot preside in the case, whether or not that interest actually affected the outcome. See, e.g., *Brown v. Vance,* 637 F.2d 272, 282 (5th Cir.1981).

█ It is true that some of the cases we have cited arise under the statutes that require disqualification of federal judges for bias, prejudice, or conflict of interest. See 28 U.S.C. §§ 144, 455. But insofar as

the statutes require recusal for actual bias or prejudice as distinct from a mere appearance of bias or prejudice, see *Margoles v. Johns*, 660 F.2d 291, 296 (7th Cir.1981) (per curiam) (which incidentally was a civil rather than criminal case), they are declaratory of constitutional requirements. See, e.g., *United States v. Sciuto*, 531 F.2d 842, 845 (7th Cir.1976); *Knapp v. Kinsey*, 232 F.2d 458, 465 (6th Cir.1956).

It is also true that the judge's prejudice in this case was directed toward the lawyer rather than the client. But the judge who is so hostile to a lawyer as to doom the client to defeat deprives the client of the right to an impartial tribunal. See, e.g., *Bell v. Chandler*, 569 F.2d 556 (10th Cir. 1978). The reluctance to disqualify a judge on the basis of apparent hostility to a lawyer, a reluctance well illustrated by Judge Friendly's opinion in *Rosen v. Sugarman*, 357 F.2d 794, 797–800 (2d Cir.1966), reflects the difficulty of distinguishing between unreasoning prejudice and an often well-founded judicial impatience with a lawyer's obstructive tactics. There is of course an element of such impatience here. But Judge Seraphim went far beyond the bounds of permissible criticism of a lawyer's tactics when he accused Clark of personal ingratitude. And he implied, or could be understood to be implying, that he was angry at the lawyer because the client was unworthy of the protracted efforts that the lawyer was making on his behalf. The judge's partiality at the suppression hearing, his bizarre conduct in answering questions put to Walberg before Walberg could answer, his insistence that the defendant's lawyer owed his first allegiance to the judge as a family friend and benefactor, his congratulating the jury on their speed, and the haste with which he imposed an exceedingly severe sentence, when taken all together, show that Judge Seraphim committed an egregious breach of judicial decorum—more so, for example, than the angry outburst of the judge in *Wilks v. Israel*, 627 F.2d 32, 36–37 (7th Cir.1980), whom the defendant assaulted. The judge in *Wilks* said, "he is going away for so long they are going to forget that they ever knew him,"

*id.* at 36, but the provocation was extreme, and the outburst of judicial wrath, which quickly subsided, was an isolated incident in the proceedings.

Yet despite all we have said, we are by no means sure that Judge Seraphim was prejudiced against Walberg. His hostility to Clark may not have lapped over to Walberg; his hostility to Walberg may have reflected no more than a well-founded belief that Walberg was guilty. Our *Margoles* decision, cited earlier, although a civil case, makes us hesitate to hold that a mere appearance of prejudice is enough to overturn a state criminal conviction on federal constitutional grounds—especially since it is not necessary to hold that in this case; there must be a new trial in any event. But Judge Seraphim's indecorous conduct reinforces our earlier conclusion that he prevented Walberg from being effectively represented by counsel. The judge's hostility to Walberg made even more important than is usually the case that Walberg have a vigorous, forthright, aggressive counsel who might appeal to the jury as it were over Judge Seraphim's head. The judge may have cowed Walberg's lawyer.

In judging the fairness of a trial it is sometimes helpful to adopt the vantage point of the defendant and ask whether a rational albeit criminal individual could be persuaded that he had had a fair trial, by which we mean here simply a trial in which an innocent defendant would be reasonably assured of acquittal. We do not think it would be possible to convince Walberg of this even if he were capable of appraising the situation objectively. What he saw in the dock was that his lawyer got in trouble with the judge because the judge thought his client too obviously guilty to merit such strenuous efforts on his behalf; that after being rebuked for his ingratitude to the judge the lawyer managed at trial to avoid the judge's wrath; that the jury brought in a verdict with great haste for which the jurors received the judge's congratulations; and, that the judge proceeded to impose an exceedingly harsh, albeit legal, sentence on him. The appearance was of a judge who

had made up his mind at the start that the defendant was guilty and who proceeded to intimidate the defendant's lawyer so that the proceeding could be got over with and Walberg shipped off to prison for many years. Guilty as Walberg undoubtedly is—unworthy a member of the community as he undoubtedly is—he was entitled to a better procedure.

The judgment is reversed with directions to the district court to order Walberg released from custody under the sentences imposed by Judge Seraphim, unless the state brings Walberg to trial within 120 days.

REVERSED WITH DIRECTIONS.

WESLEY E. BROWN, Senior District Judge, dissenting.

I must respectfully dissent from the majority opinion because of my belief that the petitioner failed to carry his burden of proof to support his contention that he was denied effective assistance of counsel contrary to his constitutional right to due process of law. 28 U.S.C.A. Sec. 2254(d). My conclusion does not, of course, endorse the conduct of the state trial judge, or excuse his reprehensible behavior in any manner.

I believe that the findings of fact by the Wisconsin court must be accorded a "presumption of correctness" in this habeae corpus case, under the rule of *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). In the absence of any evidence that the conduct of the judge affected trial counsel or the jury at the subsequent trial, I believe this presumption must prevail.

While I recognize that the decision of this Circuit in *Margoles v. Johns*, 660 F.2d 291 (7 Cir.1981), *cert. den.*, 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982), involved a civil action, the ruling there is most persuasive that proof, as opposed to speculation, of the denial of due process is required:

> "A litigant is denied the fundamental fairness to which he is constitutionally entitled if the judge of his case is unfairly biased against him. However, a litigant is not denied due process by either the 'appearance' of partiality or by circumstances which might lead one to speculate as to a judge's impartiality. A litigant is denied due process if he is *in fact* treated unfairly." 660 F.2d at 296, (emphasis of the court).

Here, I do not believe that speculation or the "appearance" of a denial of due process, should override the findings of the state courts, or the conclusion of the federal district court.

It is to be noted that under the amendment to Rule 52(a), Fed.R.Civ.Proc., to take effect on August 1, 1985, a district court's findings of fact, whether based on oral or documentary evidence, cannot be set aside unless they are found to be clearly erroneous. This rule is in accordance with the Supreme Court's recent ruling in *Anderson v. Bessemer City*, 470 U.S. ——, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

I would affirm the judgment below.