Alan L. BALLINGER, Petitioner,

v.

Forbes BYRON, Superintendent, MCI
Concord, et al., Respondents.

No. 98–12377–REK.

United States District Court,
D. Massachusetts.

May 25, 2000.

Alan L. Ballinger, Bridgewater, MA, petitioner pro se, Joseph F. Krowski, Brockton, MA, for Alan L. Ballinger, petitioner.

Susanne G. Levsen, Assistant Attorney General, Criminal Bureau, Boston, MA, for M.C.I. Concord, Superintendent, MCI Concord, respondent.

### Opinion

KEETON, District Judge.

Pending for consideration is Petitioner Alan Ballinger's Amended Petition for Writ of Habeas Corpus (Docket No. 7, filed March 12, 1999), as further amended by Petitioner's Motion to Amend (Docket No. 17, filed August 26, 1999), with Memorandum in Support (Docket No. 5, filed January 4, 1999). On March 10, 2000, respondents filed a Memorandum in Opposition (Docket No. 25). On March 20, 2000, petitioner filed a Reply to Respondents' Memorandum in Opposition (Docket No. 26).

The parties appeared and made oral arguments at hearings held on January 11, 2000, and March 29, 2000. The petition is now ready for consideration on the merits.

## I. Factual and Procedural Background

### A. Procedural History

On December 21, 1992, a Plymouth County grand jury indicted Ballinger for five counts of rape of a child in violation of M.G.L. c. 265, § 23, and one count of indecent assault and battery on a person 14 or over in violation of M.G.L. c. 265, § 13H.

On February 17, 1994, Ballinger was tried before a Plymouth County jury with Justice Mathers presiding. On February 24, 1994, the jury began deliberations. Approximately three hours later, the jury returned guilty verdicts on all six counts. Judge Mathers sentenced Ballinger to three concurrent life sentences on three of the rape convictions, a consecutive term of twelve to fifteen years on the remaining two rape convictions, and a concurrent term of three to five years on the indecent assault and battery conviction.

Ballinger appealed his conviction to the Massachusetts Appeals Court. On October 20, 1997, the Appeals Court affirmed the convictions in a published opinion, *Commonwealth v. Ballinger*, 43 Mass.App. Ct. 1116, 686 N.E.2d 492 (1997).

Ballinger filed an Application for Further Appellate Review in the Massachusetts Supreme Judicial Court ("SJC"). On November 27, 1997, the SJC denied the Application. *Commonwealth v. Ballinger*, 426 Mass. 1105 (1997).

Ballinger filed a petition for writ of habeas corpus with this court on November 1, 1998. On January 4, 1999, petitioner filed a motion to amend his petition. After I granted the motion, Ballinger filed an amended petition on March 12, 1999. On March 26, 1999, Ballinger moved to amend his petition again, and I granted the motion on September 7, 1999.

## B. Petitioner's Arguments for Habeas Corpus Relief

Petitioner argues that the trial judge improperly questioned two of petitioner's witnesses and made disparaging remarks on three occasions to petitioner's counsel. Petitioner argues that this conduct denied him a fair and impartial jury trial within the meaning of the United States Constitution. *See* Docket No. 5 at 3.

Petitioner also contends that he was wrongfully denied the opportunity for further inquiry of two potential jurors and was forced to use two of his peremptory challenges. Petitioner moved for additional peremptory challenges, but the trial judge denied his motion. Petitioner argues that this denial constitutes a prejudicial diminution of peremptory challenges that violated his right to be tried by an impartial jury. See Docket No. 7 at 6.

## C. Facts at Trial

### 1. As recited by the Massachusetts Appeals Court

The Massachusetts Appeals Court provided the following recitation of the facts "as the jury would have been warranted in finding and that are generally helpful to an understanding of the issues on appeal." Memorandum and Order at 1, Docket No. 28.

R.B.[1] was a foster child of the defendant's brother and sister-in-law. Her allegations are as follows. She was 12–13 years old when the defendant first touched her sexually while visiting at her house in Kingston. The defendant came up behind her in the kitchen while her brother was in the room, rubbed his crotch against her and put his arms around her to touch her breasts. The defendant then turned her around and placed her hands on his penis. She backed away in disgust. On another occasion, R.B. was staying overnight at the defendant's house while visiting his daughter, Samantha Ballinger (Samantha). That night, the defendant woke up R.B., sat her next to him, unzipped his pants and pulled out his penis. He then placed R.B.'s hand on it and moved her hand up and down while he ejaculated. he wiped her hand off with a towel and told her not to tell anyone because no one would believe her. She felt disgusted and ashamed. The defendant continued to make sexual contact with R.B. when she visited his daughter, feeling her breasts, inserting his finger in her vagina and ejaculating in her mouth. When he ejaculated in her mouth, she would run away and spit it out. She often told her parents she did not want to stay at the defendant's house but they told her she had to go.

The defendant moved to a new house in Kingston in 1982 or 1983 and had R.B. perform oral sex three times in the living room there. Once, she threw up in the bathroom after he had ejaculated in her mouth. The defendant stopped sexually abusing R.B. when she was fourteen and stopped spending time at his house. She moved out of her parents' house when she was fifteen. She never told them or her social worker what had happened because she thought they would not believe her and she did not trust many people. She also did not report anything to the police because

---

1. Pursuant to the Commonwealth's brief, the three victims are referred to by their initials, R.B., S.C. and J.L.

the defendant was a police officer.[2]

S.C. was twelve in 1981 when she began spending a great deal of time during the summer visiting Samantha at the defendant's house in Carver. S.C. alleges that the defendant touched her for the first time that summer. She was watching television and the defendant, wearing shorts and a T-shirt, sat next to her and began kissing her. He then placed her hand on his penis under his underwear and had her stroke it. He also told her how special and mature she was. That summer, the defendant had S.C. masturbate him or watch him masturbate, kissed S.C. and fondled her breasts whenever he had her alone in the house. The defendant told her that he knew she was mature enough not to tell anybody and indicated that he could do things for her later in life such as getting her a car or money. After that summer, S.C. would babysit for the defendant's son and occasionally the defendant would have her perform oral sex on him on the way home. Once, after the oral sex, the defendant paid her for babysitting and also gave her extra "spending money." S.C. did not tell her mother, stepfather or Samantha about anything sexual the defendant had done with her because she was confused and admired the defendant and because he was a police officer and the father of her best friend.

S.C. further alleges that when she was 13 or 14 years old, the defendant began having intercourse with her at his new house in Kingston. The sexual intercourse occurred about 10–15 times. The defendant asked her to take off her clothes and get on the bed in his master bedroom. He then took his clothes off, kissed and touched her and told her she was old enough to be a woman and very mature for her age. The defendant did not ejaculate inside S.C. until a few years later when he told her that he had

had a vasectomy. Once, the defendant showed her a dildo before they had sex. The defendant stopped this activity when S.C. was 16 and no longer a close friend of Samantha's and therefore did not visit the defendant's house.

J.L. lived two houses down from the defendant in Kingston. J.L. alleges that one day, in 1987 when she was 14 years old, she went to the defendant's house to play with his son. The defendant told her that his son was at the boy's mother's house and invited J.L. inside. She went inside the house thinking that the son would be home soon. The defendant told J.L. that he had to "jerk off" because his wife was not sexually active anymore. He also gave her a magazine with pictures of naked men in it which she immediately gave back to him. He sat next to her and she saw that his penis was exposed and that he was playing with it. The defendant asked her if she wanted to help him. She did not but did not say anything because she was scared. The defendant took her hand and put it on his penis and put his other arm around her and touched her nipple. He then ejaculated after moving her hand up and down on his penis.

J.L. did not tell her parents about this incident because she thought that they would be upset with her and call her a slut. They had warned her about situations like this and she had said she would never let something like that happen to her. J.L. later told her best friends, Casey Comerford and Stacey Estabrook, about what had happened to her but did not tell them all of the details because she was embarrassed. She made them promise not to tell anybody. J.L. never went near the defendant's house again.

In 1991, when J.L. was 18 years old,

---

**2.** The defendant was a Kingston police officer and later a Sergeant. He became the Chief of Police in Kingston in 1990 and remained in that position until the time of his indictment in 1992.

she and her father,[3] William McCarthy (McCarthy), ran into the defendant at the Plymouth County Courthouse. At this time, J.L. told McCarthy about the incident four years earlier. She later found out about the defendant's sexual abuse of R.B., and, at McCarthy's request, both girls wrote letters detailing the incidents of sexual abuse by the defendant. McCarthy sent the letters anonymously to the Plymouth County District Attorney's Office, although the letters were signed by the girls. Sergeant Robert Kelliher (Kelliher) was assigned the case in August, 1992, and arranged to meet with the girls. S.C. came forward in the fall of 1992 with her account of sexual abuse by the defendant. Kelliher also interviewed the defendant's ex-wife and various neighbors and Kingston police officers. He received an arrest warrant for the defendant on December 12, 1994, and obtained and executed a search warrant at the defendant's home on the same day. Although the search did not reveal sex magazines or a dildo, the police found a deck of cards with naked women on them, a pair of red crotchless panties, a baby pacifier in the shape of a penis, an elephant trunk into which a penis could be inserted and some condoms.

The defendant denied all of the complainants' allegations. He also testified at trial, denying that he had sexually abused or raped any of the three complainants. he admitted having had a vasectomy in October, 1988. He explained that the sex items found in his home had been given to him for his 40th birthday and had stayed in his drawer for 7 years. He presented other witnesses, including Samantha, who testified that, as far as they knew, R.B. and S.C. were never alone with the defendant and only came over for family and group gatherings. The defendant's son also testified that he never played with J.L.

3. The record is unclear as to whether McCar-

The defendant also recounted incidents involving each of the complainants prior to their allegations. He claimed to have paid for a used car for S.C. with the agreement that she would pay him back on a monthly basis. When she failed to do so the defendant took the car back. The defendant testified that J.L. had asked him, in February, 1991, for permission to see her boyfriend in the lock-up at the Plymouth District Court. When he said that he couldn't allow that, J.L. called him "some fucking neighbor." Similarly, with respect to R.B., the defendant testified that in May, 1991, R.B. had asked him to help her get her children back from DSS. When he told her that he did not have the authority or ability to intervene, she called him a "fucking asshole."

*Id.* at 2–7.

### 2. Judge's Comments at Trial

The trial judge made the following statements during trial in interactions between the judge and petitioner's trial counsel:

i) MR. JOHNSON: May I have a moment, Your Honor?

THE COURT: Well, yes, Mr. Johnson. I'd sure like to pick it up a little. We will be here until Easter.

Trial Transcript, Vol. III at 124.

ii) Q: Did it seem unusual that Alan would come up and grab you while your brother was present in the same room?

THE COURT: Excluded.

MS. CAULO: Objection.

MR. JOHNSON: May we have an objection before the ruling?

THE COURT: I will rule when I see a need to rule, Mr. Johnson, whether there is an objection or not. The question is improper. And I think that will affect this jury adversely and will rule on it whether counsel objects or not.

Trial Transcript, Vol. IV at 50.

iii) Q: Your father is Thomas Kane?

thy is, in fact, J.L.'s father or her grandfather.

A: Correct.

Q: That's not the same person who is the father of [S.C.]?

A: No.

MR. JOHNSON: Objection.

THE COURT: Allow that.

MR. JOHNSON: Irrelevant.

THE COURT: Well, I ruled it relevant, Mr. Johnson. I'm the fellow that makes the rules here.

MR. JOHNSON: May I be heard at sidebar, Your Honor?

THE COURT: No. Sit down.

MR. JOHNSON: I object to that, too.

Trial Transcript, Vol. VI at 38.

The trial judge also asked questions of witnesses on several occasions, two of which occasions petitioner objects to on appeal. The first instance occurred when petitioner's former wife, Phyllis Bayer, was testifying on behalf of the Commonwealth and gave testimony on the stand that was inconsistent with her prior statements on several occasions, memorialized in police reports. The trial judge excused the jury for several minutes and the following exchange took place:

THE COURT: Let me see it. I am going to show you a report of Robert Kelliher of the Massachusetts State Police and ask you to read that.

A: Out loud or to myself?

THE COURT: Just to yourself. Just read it to yourself.

MR. JOHNSON: While the witness is reading, may I make inquiry as to why this witness is being permitted to read the statement and the previous witness was required to do so in the presence of the jury?

THE COURT: Certainly you may.

MR. JOHNSON: I do so.

THE COURT: Thank you.

MR. JOHNSON: Does the court decline to answer the inquiry?

THE COURT: Sorry?

MR. JOHNSON: Does the court decline to answer the inquiry?

THE COURT: Yes. I don't have any reason to respond to the inquiry. Did you read both pages?

A: Yes, I did.

THE COURT: Your testimony, Ms. Bayer, so far has been inconsistent with certain parts of this report. Are you aware of that?

A: Yes, I am, sir.

THE COURT: Do you understand the problems that can arise from taking the witness stand under oath and testifying untruthfully?

A: Yes.

THE COURT: Is there anything that you want to change about your testimony in this case?

A: No, sir.

THE COURT: All right.

MR. JOHNSON: May the record reflect the defendant's exception to the court's comment to the witness concerning the oath.

THE COURT: I want you to show the report to the witness when the jury returns.

Trial Transcript, Vol. IV at 128–29.

The second colloquy occurred following the re-direct examination of defense witness Sean Daley, complainant S.C.'s brother, after Daley had testified that, during the several years that petitioner was allegedly sexually abusing S.C., S.C. could not have gone to petitioner's house alone because S.C. and Daley were always together. After re-direct examination by defense counsel, the trial judge asked the following questions:

THE COURT: Do you keep a diary or something?

THE WITNESS: No, sir.

THE COURT: How do you know where your sister was one particular time or another?

THE WITNESS: We all hung around together, sir.

THE COURT: You were inseparable?

THE WITNESS: Basically. Every place she went, I went. We were never alone.

THE COURT: You weren't? Your sisters Lisa and [S.C.] were never out of each other's company.

THE WITNESS: No, sir.

THE COURT: Twenty-four hours a day, you were together?

THE WITNESS: Yes, sir.

THE COURT: Is that right?

THE WITNESS: Yes.

THE COURT: Thank you very much.

MR. JOHNSON: The defendant rests, Your Honor.

MS. CAULO: May we approach?

*BENCH CONFERENCE:*

MR. JOHNSON: Your Honor, for the record I want to take exception to the colloquy with the witness. I know you have a right to inquire but I object to the tone and object to the questions.

THE COURT: That witness is going to be lucky if I don't hold him for perjury.

MR. JOHNSON: Well, I object to that comment as well, Your Honor.

THE COURT: Very well. Your objection is noted.

Trial Transcript, Vol. VI at 49–51.

## II. Standard of Review

This habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act, Pub.L. No. 104–132, 110 Stat. 1214 (1996) (codified in scattered sections of 28 U.S.C.) (hereinafter "AEDPA"). That statute, enacted in 1996, greatly reduced the scope of a federal trial court's habeas review over a state court proceeding. For purposes of this petition, the most pertinent respect in which Congress reduced the scope of habeas review concerns review of a state court's legal determinations. Under AEDPA, when a federal court reviews a state court's legal determinations, including "mixed questions of law and fact in which legal principles are applied to historical facts," *Coombs v. State of Maine*, 202 F.3d 14, 18 (1st Cir. 2000), habeas relief is to be granted only where the state court's adjudication

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d)(1) has been the subject of much interpretation and controversy among the circuit courts of appeals. In April of 2000, the Supreme Court resolved some of the conflict through its decision in *Williams v. Taylor*, —— U.S. ——, 120 S.Ct. 1495, 146 L.Ed.2d 389. The Court rejected the notion that the "unreasonable application" clause reiterated the "contrary to" clause, holding that the two statutory clauses have "independent meaning." *Id.* at 1519. The Court gave two examples of a state-court decision that would violate the statute's "contrary to" clause. First, "[a] state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Id.* Second, "[a] state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 1519–20.

The second step in a section 2254(d)(1) analysis is triggered when the federal habeas court finds "no Supreme Court precedent [that] is dispositive of a petitioner's claim, [and thus] ... a fortiori, ... no specific rule to which the state court's

decision can be 'contrary.'" *O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir.1998). In *Williams,* the Supreme Court held that, under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." —— U.S. at ——, 120 S.Ct. at 1523. In analyzing how a federal court should determine "unreasonableness," the Court rejected a subjective, or mixed subjective-objective inquiry, holding that the touchstone was "objective unreasonableness:"

> Stated simply, a federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case.

*Id.* at 1521–22.

Finally, although the Supreme Court did not explicitly address the issue in *Williams,* the Court of Appeals for the First Circuit, in *Vieux v. Pepe,* further explained the analytic framework of section 2254(d)(1) by stating that a federal habeas court must reach both prongs of section 2254(d)(1), even if a decision under the first seems to foreclose a contrary decision under the second.

> [I]n certain cases, especially those involving non-"framework" claims, Court precedent will be sufficiently specific that petitioner's claim will either be contrary to or entirely consonant with the Court's rulings. If the state decision is consistent with the relevant Court decision, it plainly would not be an unreasonable application of Court precedent. Therefore, the federal court will be able

to dispatch swiftly any argument under the second step of analysis.

> To say this, however, is not to say that the second step analysis is unnecessary, for unless a habeas court grants relief under the "contrary to" prong, it will be required to analyze the petitioner's claim under the "unreasonable application" prong as well. To rule otherwise would be to ignore the word "or" in the statute limiting our power to grant the writ if the state decision was "contrary to, or involved an unreasonable application of," federal law.

*Vieux v. Pepe,* 184 F.3d 59, 64 (1st Cir. 1999) (citations omitted).

## III. Review of Constitutional Claims

### A. Inappropriate Judicial Conduct

■ The petitioner argues that the trial judge's comments at trial to defense counsel, identified in Part II above, as well as his questioning of witnesses Phyllis Bayer and Sean Daley, deprived petitioner of a fair trial guaranteed by the U.S. Constitution. Petitioner's argument can be understood in two ways: first, that the trial judge's behavior in front of the jury manifested, to a reasonable juror, that he was an advocate for conviction, impermissibly affecting the jury's interpretation of the evidence; second, that the trial judge's behavior during the whole course of trial demonstrated that he was impermissibly biased against petitioner. In order for habeas relief to be granted, petitioner must demonstrate to this court that the Massachusetts Court of Appeals engaged in legal interpretation and application that was either contrary to or an unreasonable application of federal law, as determined by the Supreme Court, to the facts of petitioner's case.

■ The first step I must take as a federal judge reviewing a state-court determination under § 2254(d)(1) is to consider whether the Supreme Court has either declared a rule that governs petitioner's case or has made a decision

whose factual similarity compels an outcome in petitioner's case. The only Supreme Court case that petitioner cites in his initial brief in support of his argument for habeas relief on this ground is *Quercia v. United States*, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933). In *Quercia*, the Supreme Court reversed the appellant's conviction because the trial judge stated to the jury during the jury charge that he believed the defendant was lying and the Court held that these statements precluded a fair and dispassionate consideration of the evidence. The Court determined that the trial judge had exceeded the scope of his discretion as "governor of the trial," and that his "error" was "highly prejudicial." 289 U.S. at 469, 472, 53 S.Ct. 698, 699, 77 L.Ed. 1321. The Court, invoking its supervisory power, reversed the trial judge. The Court did not act under its authority to enforce the Due Process clause of the Fifth Amendment. *See id.*, 289 U.S. at 469, 53 S.Ct. at 699.

██ Although Supreme Court decisions, invoking supervisory power, concerning the scope and limits of judicial behavior during trial are binding on this court, they do not similarly constrain the justices of the Massachusetts Superior Court. *See Harris v. Rivera*, 454 U.S. 339, 344–45, 102 S.Ct. 460, 464, 70 L.Ed.2d 530 (1981) ("Federal judges have no general supervisory power over state trial judges; they may not require the observance of any special procedures except when necessary to assure compliance with the dictates of the Federal Constitution."). Petitioner cites many cases in the Massachusetts Court of Appeals and the Supreme Judicial Court to support his indictment of the trial judge's conduct. Those decisions, reversals of state trial court decisions under state common law supervisory power, are not "clearly established federal law, as determined by the Supreme Court," and are, thus, not within the scope of § 2254(d)(1). Neither *Quercia* nor any of the state cases cited in petitioner's initial brief provides a rule governing petitioner's case.

In his reply brief, petitioner points to *Arizona v. Fulminante*, 499 U.S. 279, 309–10, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991), as support for the argument that the presence of a biased trial judge constitutes a "structural defect" and that the Massachusetts Appeals Court applied the wrong standard in analyzing the facts in petitioner's case. In *Fulminante*, the Court held that the admission of an involuntary confession was subject to "harmless error" analysis, distinguishing such an admission, a "trial error," from more serious constitutional violations such as "the presence on the bench of a judge who is not impartial," which the Court described as a "structural error." *Id.* If a reviewing court finds that a "structural error" occurred at trial, the guilty verdict must be reversed. *See Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967). Although *Chapman* and *Fulminante* both refer to the presence of a biased judge as exemplary of structural error, neither case creates a rule, or prescribes a set of facts, to guide courts in determining when a judge's impartiality is sufficiently in question to warrant a finding of structural defect. Both cases refer to the earlier decision of *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), in which the Court reversed a conviction of unlawful possession of intoxicating liquor because the presiding judge, the mayor of the village, had a financial stake in the outcome of the case. Recently, the Court revisited the issue of "actual bias," granting a habeas petitioner's request for discovery on his due process claims where the judge before whom he was convicted was later convicted of taking bribes from defendants in criminal cases. *Bracy v. Gramley*, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997). These cases do not lay out a "rule" concerning judicial bias that the Massachusetts Appeals Court was obligated to apply to the present case, nor by their factual

similarity do they compel a result in this case. *See O'Brien, supra*, 145 F.3d at 25.

Having determined that the Massachusetts Appeals Court did not act contrary to clearly established federal law, I now turn to the second prong of § 2254(d)(1), the "unreasonable application" clause. The Federal Constitution guarantees all citizens the right to a fair trial by an impartial judge and jury. It is also the case, however, that a trial judge in either the state or the federal system has the common law power to "question witnesses and to analyze, dissect, explain, summarize, and comment on the evidence." *Logue v. Dore*, 103 F.3d 1040, 1045 (1st Cir.1997); *see also Quercia, supra.* The Due Process Clause of the Fifth and Fourteenth Amendments circumscribes the extent to which a trial judge may exercise that power. The state and federal courts have used their supervisory powers to further constrain trial judges more than is required by the Federal Constitution. *See Bracy, supra*, 520 U.S. at 904, 117 S.Ct. at 1797 ("[M]ost questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard.").

In reviewing the Massachusetts Appeals Court's memorandum denying Ballinger's direct appeal, I can grant the writ only if I determine that the Appeals Court's determination that the trial judge's misbehavior did not reach constitutional magnitude was "objectively unreasonable." *Williams, supra*, —— U.S. at ——, 120 S.Ct. at 1521. Petitioner argues that the Appeals Court correctly found that the trial judge's behavior was improper, but applied the wrong legal standard. Petitioner avers that any misconduct by a trial judge is *per se* structural error, requiring reversal. Docket No. 26 at 3. This argument is not supported by precedents. *See, e.g., Bracy, supra*, 520 U.S. at 904, 117 S.Ct. at 1797. Petitioner can make out a case for structural error if he can demonstrate either that the judge was actually biased, as was the case in *Quercia* and *Bracy,* or that the trial judge's behavior fundamentally affected the fairness of the trial proceedings. *See Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941).

The Massachusetts Appeals Court considered the five instances of alleged judicial misconduct, described in Part II above, and found them "regrettable" but determined that the trial judge's behavior "cannot be deemed to have deprived the defendant of a fair trial when considered in the context of the entire trial and the charge to the jury." Memorandum and Order at 13. With respect to the statements identified in Part II as (i)–(iii) and directed at defense counsel, these judicial comments can be considered in two ways. First, the trial judge's statements could be understood to reveal the judge as an advocate for conviction. Second, the trial judge's statements could be understood to reveal the judge's desire to complete the trial and allow the jury to deliberate. Behavior consistent with the latter motivation could include chastising defense counsel for failing to follow court's orders or telling defense counsel it does not want him delaying the trial. After reviewing these statements both in the context in which they were made and in the larger context of the transcripts of the entire trial, I find that these comments did not reveal a latent bias of the trial judge and did not impermissibly affect the impartiality of the jury.

I now consider the trial judge's questioning of Phyllis Bayer and Sean Daley. These two events are conceptually distinct, in that the questioning of Phyllis Bayer outside the presence of the jury has different implications for the fairness of the proceedings than does the questioning of Sean Daley in the presence of the jury. The trial judge held a conference outside the presence of the jury in response to Bayer's statements on the stand that were

inconsistent with her prior statements to the police. After excusing the jury, the judge asked Bayer to read her written statement, advised her of the consequences of perjury, and asked Bayer if she wanted to change her testimony. When Bayer declined to alter her testimony, the trial judge told the Commonwealth's counsel to show her, in the presence of the jury, the written report of her earlier statements. After the jury returned, the Commonwealth's counsel challenged Bayer's in-court testimony by confronting her with the report, and Bayer explained the reasons for the inconsistency. In 1972, the Supreme Court overturned a conviction on the ground that the trial judge "gratuitously singled out ... one witness for a lengthy admonition on the dangers of perjury." *Webb v. Texas,* 409 U.S. 95, 97, 93 S.Ct. 351, 353, 34 L.Ed.2d 330 (1972). In that case, the Court held that because the trial judge singled out one defense witness, manifested his belief that the witness was likely to lie, engaged the witness in lengthy admonitions about the consequences of perjury, and because the witness then chose not to testify, the trial judge's behavior deprived defendant of due process rights guaranteed by the Fourteenth Amendment. 409 U.S. at 97–98, 93 S.Ct. at 353–54. The facts of this case are of a different order from those in *Webb.* Most significantly, the witness here chose to continue to testify and did not change her testimony. The petitioner has not demonstrated that the trial judge's questioning of Bayer impermissibly affected the impartiality of the jury or that it denied petitioner the opportunity to present witnesses for his own defense.

 The trial judge's questioning of Sean Daley is a somewhat different case because it occurred in the presence of the jury. The Supreme Court has not provided any specific guidance concerning the limits of judicial questioning of witnesses, the most relevant direction coming from *Quercia:*

This privilege of the judge to comment on the facts has its inherent limitations. His discretion is not arbitrary and uncontrolled, but judicial to be exercised in conformity with the standards governing the judicial office. In commenting upon testimony he may not assume the role of a witness. He may analyze and dissect the evidence, but he may not either distort it or add to it.... This court has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence should be so given as not to mislead, and especially that it should not be one-sided.

289 U.S. at 470, 53 S.Ct. at 699 (internal quotation marks omitted). Although the passage quoted above provides some guidance as to the kinds of judicial conduct that the Court is concerned about, it is not dispositive in this case because the Court in *Quercia* reversed the conviction under its supervisory powers. The nature of judicial misconduct necessary to justify granting the writ in the context of a federal habeas court reviewing a state court for constitutional violation is significantly different. The Court of Appeals for the Second Circuit addressed this issue in its opinion in *Daye v. Attorney General,* 712 F.2d 1566 (2d Cir.1983):

Because trial judge intervention will exceed federal standards of judicial propriety before transgressing the limits of fundamental fairness required by the Constitution, federal courts have had little opportunity to delineate the constitutional bounds of trial judge intervention. It is only in reviewing a habeas corpus petition ... that we must distinguish between the extent of trial court intervention that offends federal court standards and the more fundamentally unfair conduct that exceeds constitutional limits. The distinction reflects an important facet of federalism: federal courts have authority under their supervisory powers to oversee the administration of criminal justice within federal courts and lack such authority with re-

spect to state courts. The only commands that federal courts can enforce in state courts are those of the Constitution.

*Id.* at 1572 (footnotes omitted). The court in *Daye* affirmed the denial of a petition for habeas corpus concerning a case in which the trial judge had conducted substantial questioning of numerous witnesses, including the defendant. Here, the trial judge questioned only a few witnesses, including Sean Daley, and did not question the defendant. The substance and tenor of the judge's questioning of Daley could be interpreted by a reasonable juror as expressing the trial judge's skepticism of Daley's testimony as completely truthful. *See* Trial Transcript, Vol. VI at 50 ("Twenty-four hours a day, you were together?"). Daley was one of a series of witnesses each of whom alleged that he was never apart from one of the complainants. The trial judge could reasonably be understood to be pushing Daley to clarify whether Daley and S.C. were generally together, were together whenever they had free time, or were never apart, even for a moment. The answers to these questions could help the jury make an assessment of the credibility of the witness. The court in *Daye* reviewed much tougher questioning by the trial judge of the defendant concerning the defendant's account of the circumstances of the crime and concluded that it did not rise to the level of a constitutional violation. 712 F.2d at 1569–70, 1572–73. The First Circuit has approved, in the context of its supervisory powers, judicial questioning by a trial court "to throw light upon testimony" or to "provide a clear presentation of the issues" as long as an attitude of impartiality is maintained. *United States v. Fernandez*, 145 F.3d 59, 66 (1998) (quoting *Logue, supra*, 103 F.3d at 1045). In *Fernandez*, the court considered extensive questioning of the defendant by the trial judge, some of it "sharp" questioning, and concluded that in context, and considering the jury charge, the trial judge did not commit error. 145 F.3d at 66. In this case the Massachusetts Appeals Court reviewed the full trial transcript and determined that these selected communications, in the context of the whole trial and the jury charge, did not violate petitioner's right to a fair trial. Memorandum and Order at 13.

I find that the trial judge's questioning of Daley did not infringe petitioner's right to a fair trial by an impartial jury. Because I find that the trial judge's statements did not substantially prejudice the fairness of petitioner's trial, I determine *a fortiori* that the Massachusetts Court of Appeals was not "objectively unreasonable" in finding that these comments did not constitute a violation of the defendant's constitutional right to a fair and impartial judge and jury.

Apart from questioning in the presence of the jury, petitioner argues that the judge's comments to defense counsel at trial, as well as the trial judge's questioning of Phyllis Bayer indicate the judge's bias against petitioner. For the reasons stated above, these incidents individually do not indicate bias, nor do they sustain a charge of bias when aggregated.

## B. Peremptory Challenges

During the course of jury selection, trial counsel twice moved for further inquiry of potential jurors. One potential juror had been the victim of a stalking crime, and one had been the victim of a rape and the defendant had not been convicted. The trial judge denied trial counsel's motions and trial counsel used two of his sixteen peremptory challenges to excuse those jurors. Trial counsel later moved for two additional peremptory challenges and was denied them. Petitioner now argues that the denial of two additional peremptory challenges violated his right to be tried by an impartial jury under the Sixth and Fourteenth Amendments to the Federal Constitution.

The Massachusetts Appeals Court determined that the trial judge had not abused his discretion in failing to excuse the chal-

lenged jurors for cause. Memorandum and Order at 16–18. Both jurors stated in their questionnaires that, notwithstanding their past experiences, they could be impartial jurors. The Appeals Court determined that the trial judge acted consistently with the Due Process Clause of the Fourteenth Amendment and with state law.

█ Section 2254(d)(1) grants a federal habeas court authority to review only decisions by state courts that are contrary to or unreasonable applications of clearly-established *federal* law. This court has no jurisdiction to consider alleged violations of state law. The Supreme Court has stated that diminution of peremptory challenges is a matter of state, not federal constitutional, law. *See Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988) ("[W]e reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension."); *Gray v. Mississippi,* 481 U.S. 648, 663, 107 S.Ct. 2045, 2054, 95 L.Ed.2d 622 (1987); *Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965); *Stilson v. United States,* 250 U.S. 583, 586, 40 S.Ct. 28, 29, 63 L.Ed. 1154 (1919). The Court held, in *Ross,* that peremptory challenges are a "means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." 487 U.S. at 88, 108 S.Ct. at 2278. Because petitioner does not allege any violation of federal law, his petition fails on this ground. For this reason, as well as the reasons recited above, Ballinger's petition for writ of habeas corpus will be denied.

### ORDER

For the reasons stated in the foregoing Opinion, it is ORDERED:

(1) Petitioner Alan Ballinger's Amended Petition for Writ of Habeas Corpus (Docket No.7) is DISMISSED.

(2) The Clerk is directed to enter forthwith on a separate document a Final Judgment denying the petition for writ of habeas corpus.

### Final Judgment

For the reasons stated in the Opinion of this date, it is hereby ORDERED:

The Petition for writ of habeas corpus is DENIED.